**UNITED STATES of America, Plaintiff,**

v.

**MODES, INC. & Jaikishan C. Budhrani, Defendants.**

**Court No. 89–04–00206.**

United States Court of International Trade.

June 24, 1993.

Judgment Amending Decision, June 25, 1993.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice; Velta A. Melnbrencis, Asst. Director, Michael S. Kane, Atty., Washington, DC, for plaintiff.

Wilson, White & Copeland, Claude R. Wilson, Jr., Dallas, TX, for defendants.

## OPINION AND JUDGMENT

NEWMAN, Senior Judge:

The Government brings this action to collect a civil penalty from defendants pursuant to 19 U.S.C. § 1592 (1984). This court previously granted partial summary judgment in favor of the Government on the issue of liability for fraudulent violations of section 1592, which consisted of the intentional falsification of invoices in connection with defendants' importation of Taiwanese jewelry. 16 CIT ——, 804 F.Supp. 360 (1992). The issue currently before the court is the amount of the penalty, which was tried *de novo* by the writer under section 1592(e). In view of the mitigating evidence adduced by defendants at trial, the court imposes a penalty in the amount of $50,000.

The court has exclusive jurisdiction pursuant to 28 U.S.C. § 1582(1) (1988).

### *Background*

The following was discussed in earlier stages of the instant litigation, but is summa-

rized here for convenience. Familiarity with the earlier proceedings is presumed.[1]

Defendant Jaikishan Budhrani is 52 years old. Budhrani was born in what is now Karachi, Pakistan. He emigrated to the United States in 1970 and opened a wholesale jewelry business. Early in the 1980's, Budhrani began to import jewelry through Modes Inc., the other defendant in this case, a closely held corporation headquartered in Dallas, Texas. From 1984 to 1985, Budhrani was either the vice president or the president of Modes.

During the period of January 1984 through November 1984, defendants imported costume jewelry from Taiwan, known as "twist beads," under TSUS item number 740.38. The jewelry, purchased from Taiwanese export companies operated by a Mr. Chester Chou, was entered free of duty under the Generalized System of Preferences ("GSP"). 19 U.S.C. § 2461, et seq., (1988).

In accordance with an agreement between Budhrani and Chou, purchases of jewelry from the Chou companies took place under a double invoicing system. A false invoice accompanied the merchandise as it entered Customs. This invoice, which typically stated prices at about half the actual value of the merchandise, was filed with Customs. Modes cut a check to Chou in the amount appearing at the bottom of the false invoice. Chou transmitted separately to Modes a second invoice for the same shipment, which latter invoice indicated the actual value of the merchandise. Modes paid the difference in a second check to Chou. The second invoice for each shipment was not disclosed to Customs.

In his deposition and at trial, Budhrani testified that he agreed to comply with Chou's double invoicing system because it was an accommodation to Chou's efforts to evade Taiwanese income taxes and because the goods were duty-free. Budhrani explained that the Taiwanese manufacturers required Chou to pay them in cash in order to evade Taiwanese income tax. Since Chou had no receipts from the manufacturers, he persuaded Budhrani to participate in the double invoicing system as a means of allowing Chou to cheat on his taxes as well. Chou convinced Budhrani that the undervaluation of the merchandise would not result in any adverse consequences inasmuch as the merchandise was duty-free.

Although the undervaluation of merchandise subject to the GSP cannot result in the underpayment of duty, i.e., as to the relevant entries, the price information appearing on Customs invoices is used in calculating the total value of imports of the particular merchandise in a given year.[2] Since GSP eligibility must be withdrawn when total annual sales exceed the competitive need limit, undervaluation would tend to extend GSP eligibility beyond the point where it would ordinarily obtain. See Trade Act of 1974, Pub.L. 93–618, Title V, § 504(c), Jan. 3, 1975, 88 Stat. 2070, codified as amended, 19 U.S.C. 2464(c) (1988); Florsheim Shoe Co. v. United States, 2 Fed.Cir. (T) 83, 92, 744 F.2d 787, 793 (Fed.Cir.1984). Thus, defendants' false invoicing had the potential to taint statistical calculation and deprive the Government of future revenues. In the instant case, however, defendants' false valuation of twist beads ultimately did not disrupt the administration of the GSP program because eligibility for duty-free treatment was in fact withdrawn in 1985 after Taiwan exceeded the competitive need limit for TSUS item no. 740.38 in 1984. See 50 Fed.Reg. 25,037, 25,060 (June 17, 1985).

In May 1984 Harvey McFadden, an Import Specialist with Customs, received a cor-

---

**1.** The reader is directed to United States v. Wilson, 864 F.2d 1219 (5th Cir.1989) (considering enforceability of administrative summons); United States v. Modes, Inc., 13 CIT 780, 723 F.Supp. 811 (1989) (motion to dismiss for lack of subject matter jurisdiction denied); further proceedings, 16 CIT ——, 787 F.Supp. 1466 (1992) (motion to suppress denied); 16 CIT ——, 804 F.Supp. 360 (1992) (motion for partial summary judgment granted).

**2.** The Secretary of the Treasury, in coordination with the Commerce Department and the Bureau of the Census, is required by statute to maintain statistics relating to the quantity and value of imports. See 19 U.S.C. § 1484(a), (e) (1988). False declarations of value violate § 1485a(2), thereby preventing accurate statistical compilations and violating § 1592.

rected invoice in connection with an entry of twist beads that had taken place on April 27, 1984. McFadden had requested the corrected invoice in order to verify freight and insurance charges reported in the original entry document. Pursuant to McFadden's ordinary practice, he set the corrected invoice aside until such time as other work would permit him to "associate" the invoice with the entry file to which it related. As it happened, McFadden did not match up the corrected invoice with its corresponding entry file until August 23, 1984, at which time he discovered a discrepancy in pricing information. Unlike the original document, the corrected invoice was an F.O.B. invoice that stated an F.O.B. price that was approximately twice the price stated in the original. At that time, McFadden referred the matter for further investigation.

Two months later, the case came to the attention of Dale Owens, a paralegal with Customs' commercial fraud unit. Subsequently, Owens went to visit Budhrani at his place of business on October 5, 1984, but did not find him there until two weeks later. Owens asked Budhrani to explain the discrepancy in pricing between a set of corrected invoices and the corresponding invoices that had been filed with Customs. Budhrani lied to Owens, offering the explanation that the shipper had demanded more money due to the high quality of the goods. At no point did either McFadden or Owens communicate to Budhrani that he was in violation of the law.

After Owens left, Budhrani consulted a certified public accountant and an attorney in El Paso, Texas. Upon being advised that his undervaluation of merchandise was illegal, even though the beads were duty-free, he discontinued importing.[3] Concomitantly, however, the Government was pursuing an investigation of the matter.

In early 1985, Robert W. Wallace, a Senior Special Agent with Customs, began a civil and possible criminal investigation of defen-

dants. Wallace served an administrative summons on Modes and defendants' counsel, Claude R. Wilson, Jr., seeking production of certain records required to be kept by Modes under 19 U.S.C. § 1508 (1988) in order to ensure compliance with Customs laws. At this point, the administrative summonses were directed to records ranging from the period of January 1983 through January 1985.

Wallace postponed the return date on the summonses to permit Wilson and an investigator to travel to Taiwan to question Chou and gather other relevant facts. On May 21, 1985 Wilson returned from Taiwan, carrying certain files that he used in connection with the litigation. The Customs Agent at Dallas/Fort Worth International Airport searched a briefcase containing those files, although the agent was repeatedly informed that the files were protected by the attorney-client privilege, the attorney work-product doctrine and the defendants' rights under the United States Constitution.

Customs conducted a proper routine inspection for contraband, but refused to return the files to Wilson at the end of the visual search of the briefcase. Instead, Wallace acquired the files from Customs and retained them for two days before finally returning them to Wilson. Thereupon, Wallace issued new subpoenas for the period of October 1983 through January 1985, presumably in conformance with information that he gleaned from his inspection of Wilson's files.

Defendants resisted the summonses, and Wallace filed a petition in the United States District Court for the Northern District of Texas to enforce the summonses pursuant to 19 U.S.C. § 1510 (1988). Following a magistrate's report and recommendations, the district court concluded that the summonses should be enforced. However, because the court applied an incorrect standard of review, a panel of the Fifth Circuit remanded for further proceedings, holding that the sum-

---

3. Budhrani urges the court to believe that at the time he submitted false price information, he was unaware that he was violating the laws of the United States. Thus, Budhrani states that he knew that what he was doing was "wrong," but not illegal. The court rejects Budhrani's expla-

nation. For reasons that are explained *infra,* the court finds that Budhrani knew that submission of false freight information was illegal at the time of the relevant entries and that he intentionally submitted that false information in his invoices to Customs.

monses could be enforced following the remand proceedings if the Government satisfied the standards enunciated in *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).[4] The panel further determined that defendants could not maintain a successful defense of abuse of process because the information tainted by the Government's misconduct was already the subject of the original summonses. However, the Fifth Circuit condemned in no uncertain terms the misconduct of the Customs officials involved:

> [A]lthough we do not finally resolve the dispute in question, we think it appropriate, whatever the outcome on remand, to *admonish Customs for what can only be described as outrageous and reprehensible behavior* on the occasion in question. We trust that our warning today will suffice to deter any future similar conduct.

*Wilson,* 864 F.2d at 1223 (emphasis added).

Following the running of the statute of limitations for a criminal prosecution, the Government commenced the instant action to recover a civil penalty under section 1592. Defendants then produced the information required to be disclosed under the administrative subpoenas.

Defendants moved before Judge Carman of this court to suppress the entries, invoices, and documents that had been at issue before the Fifth Circuit. After a suppression hearing, the court held that the search of Wilson's files violated the fourth amendment, finding that Customs could not articulate a reasonable suspicion that would support a seizure of the files after the initial, legal inspection. 16 CIT at ——, 787 F.Supp. at 1475. However, because the information sought to be suppressed was already the subject of administrative summonses antedating the illegal seizure of Wilson's files, and would have been sought in any event as a consequence of an investigation that had been conducted by Customs in Hong Kong, the court held that the independent source exception to the exclusionary rule compelled the denial of defendants' motion. 16 CIT at ——, 787 F.Supp. at 1476 (citing *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)). Nevertheless, the court resonated with the Fifth Circuit's description of "outrageous and reprehensible" conduct on the part of Customs, and echoed that court's admonition.[5]

Following reassignment of this case to the writer, the court granted the Government's motion for partial summary judgment on the issue of liability on October 9, 1992. 804 F.Supp. 360. Trial was held on April 1, 1993 to resolve the remaining factual issues pertaining to the subject of *quantum.*

### *Findings of Fact*

The critical witnesses at trial were Budhrani and William E. Burch, a CPA from Dallas, Texas.[6] In sum, Budhrani gave evidence that demonstrated a relatively minor degree of culpability. Burch established that defendants could not pay more than $100,000 without suffering serious hardship or even financial ruin.

■ Initially, the court pronounces its findings concerning Budhrani's intent and degree of culpability. Budhrani repeatedly stated that, during the time he participated in the double invoicing system, he understood that the submission of false value information on one invoice and the separate billing arrangement through a second invoice for the same merchandise was "wrong," but not ille-

---

4. *Powell* requires that (1) There must be a legitimate purpose of the investigation; (2) the specific inquiry must be relevant to that purpose; (3) the information sought must not already be in the government's possession; and (4) all internal administrative procedures must have been followed. 379 U.S. at 57–8, 85 S.Ct. at 255 (cited in *Wilson,* 864 F.2d at 1222).

5. The court considers that Customs' blatant misconduct in this case is paradigmatic of how government should *not,* but on occasion apparently does, behave. The court accordingly subscribes *in full* to the condemnation of that misconduct as pronounced by the Fifth Circuit and Judge Carman.

6. At trial, the court heard the testimony of several witnesses. First, McFadden and Owens appeared as witnesses for the Government. Their testimony essentially repeated the substance of affidavits that had been considered during the summary judgment phase of the litigation. Budhrani's wife also testified. The testimony of these witnesses added little and is not recounted here.

gal. When asked whether he believed at the time Owens first approached him that he had done anything to warrant an investigation, Budhrani replied:

> Well, I knew I had done something wrong to protect—to help the guy in Taiwan undervalue his goods and protect him on his taxes ... but I didn't know I was going to foul up myself. If I had known for a minute that I was going to be fouling myself up, I would never have done it.

(R. at 32). Shortly thereafter, Budhrani volunteered the following:

> ... All the time I knew I was wrong, not [illegal]. I knew importing from Taiwan duty-free was wrong, to undervalue it, but I didn't know it was illegal. I didn't think for a minute it was illegal.

(R. at 33).

The substance of Budhrani's testimony, therefore, was that he labored under a misapprehension that the duty-free status of the goods rendered his undervaluation of the goods on the invoices submitted to Customs a deception, but not a violation of the laws of the United States, in that did he not thereby deprive the United States of any revenue to be collected. However, prior to this testimony the Government had elicited the following:

> Q: Were you aware then that there was some sort of requirement for your broker to file invoices with Customs?
>
> A: Yes sir.
>
> Q: Now at the time you were importing merchandise into the United States in 1984, did you think that the requirement for filing invoices with Customs could be met by filing a falsified invoice with Customs?
>
> A: *No sir.*

(R. at 30) (emphasis added).

It is undisputed that Budhrani had some experience in importing prior to the inception of the double invoicing system with Chou, and that he was aware that his customs broker filed invoices with Customs. (R. at 26, 29–30). The court refuses to accept Budhrani's testimony that he did not intend any violation of the laws of the United States when he caused to be submitted false value information in invoices to the Customs Service. Indeed, he admitted otherwise under cross-examination. The court finds that Budhrani knew that submission of false invoices was illegal in the sense that he was required by law to file accurate invoices with Customs, and that he intentionally violated that law.

■ The court does, however, credit Budhrani's explanation of his ignorance of the GSP program. Budhrani was misled by Chou into believing that, because the twist beads were duty-free, a false declaration of the value of the goods was of no consequence to the United States whatsoever. Although the court finds that his submission of false invoices and his participation in the double invoicing scheme was intentional, the court determines that Budhrani undertook this fraud as a business accommodation to his supplier under the mistaken assumption that the falsehood was entirely inconsequential, and illegal in only a technical sense. Further, Budhrani was not aware that false statements of value would result in statistical inaccuracies and thereby impact the efficient operation of the GSP program.

The court is persuaded that Budhrani regrets having lied both to Owens and to Customs. Indeed, Budhrani made effusive expressions of remorse, the sincerity of which the court generally credits. It is plain that Budhrani had nothing to gain from his violation and had no intent to defraud the revenue.

It is beyond cavil that defendants' intentional submission of false invoices and participation in the double invoicing system violated section 1592 and justify the imposition of a penalty. Nevertheless, Budhrani's knowledge and intent were such that his degree of culpability was of a much lesser order than, for example, that of an importer who knowingly undervalues dutiable merchandise and makes false declarations to Customs with the object of evading the payment of such duty. Budhrani's misapprehension of the gravity of his offense is relevant and will be considered as a mitigating factor in the assessment of the penalty, *infra.*

■ The court next considers the testimony of William E. Burch, Budhrani's accountant. Burch testified concerning the finan-

cial ability of defendants to pay a penalty. Burch concluded that the maximum penalty that defendants could pay, i.e., without destroying them financially, would be in the range of $40,000 to $100,000. In support of this conclusion, Burch relied principally upon defendants' tax returns and other financial information.

The court finds Burch's testimony concerning defendants' ability to pay credible and persuasive. Although the Government sought to discredit the reliability of Burch's conclusions by questioning the veracity of his source of information, *viz.*, Budhrani, the court discerns little in Burch's testimony to cast doubt on his ultimate opinion.[7] Furthermore, while the Government repeatedly reserved the right to call expert witnesses on the subject of defendants' financial position, it failed to call any such witnesses, either as part of its case-in-chief or in rebuttal to Burch. Consequently, the court relies upon Burch's submissions and the underlying financial information as the factual basis by which to measure defendants' ability to pay a penalty. The court now addresses the issues of Budhrani's assets, his income from Modes, and the profitability of Modes in turn.

█ The court is satisfied that only a small portion of Budhrani's assets could be relied upon to pay a penalty. The testimony revealed, for example, that a note receivable of $180,000 plainly could not be repaid (Def.'s Ex. E–3); indeed, Burch testified that Budhrani would likely be compelled to loan additional funds to Modes to keep the company in operation. Similarly, there would be no market for the Modes stock, thereby eliminating Budhrani's investment in the company as a realistic source of funds. The court accepts as factual Burch's conclusion that the assets upon which Budhrani could rely to pay a civil penalty are his cash savings, valued at around $100,000 and the value of the rental house ($40,000, net of principal on an outstanding mortgage), for a total of approximately $140,000. The court further credits Burch's conclusion that, in addition to the net value of the rental house, Budhrani could pay up to one half of his cash balance, yielding a final composite figure of $90,000, without suffering serious hardship.

The court further observes that the income drawn by Budhrani from Modes, while large at first glance, has steadily declined over the last six years. (Def.'s Ex. E–1). It is necessary for Budhrani to travel to shows in order to market his goods, which he sells for a lower profit than he had received when he was importing. (R. at 60). Moreover, as already noted, if Modes is to survive, Budhrani may very well need to lend it considerable sums in the near future. *Budhrani also has two children, one of whom is in college, and the other in high school.* The court finds, therefore, that Budhrani's future earnings are not likely to become a significant source of funds which could support the vast amount in penalties that the Government seeks.

█ The court finally addresses the more contentious issue, the profitability of Modes. Burch submitted a document titled "Earnings History," which broke down the taxable income and the book income before and after tax of Modes for the years 1987 through 1992, inclusive. (Def.'s Ex. E–2). The exhibit also includes four-year, five-year and six-year averaging for each of those categories. Burch demonstrated that Modes suffered heavy losses in 1989 and 1991, while making only modest gains in the other years.

The Government posits that the sum paid by Modes in attorneys and accounting fees hides Modes' true profitability. The Government refers in particular to Modes' expenditure of approximately $500,000 over the period of the last 8 to 9 years for services rendered in several courts. Budhrani testified that defendants spent between $30,000 and $50,000 in legal defense in each of the last two years. Defendants also owe at least $150,000 more in connection with the trial. Consequently, the Government contends that

7. The testimony revealed some confusion as to which of the defendants paid attorney's and accounting fees. Although Budhrani testified that the corporate defendant paid fees prior to trial, Defendants' Exhibit "A" listed outstanding attorney's fees under Budhrani's personal liabilities. The court does not find that the distinction is meaningful, since any funds expended by Modes will probably be provided by Budhrani.

defendants could pay equally large sums in a penalty, i.e., once the attorney's bills have been paid, because Modes' bottom line will improve. After careful review of the financial records and Burch's testimony, the court concludes that the Government overstates the "hidden" profitability of Modes.

It is obvious that the root cause of Modes' financial woes was its withdrawal from the importing business and Budhrani's return to retailing, not the burden of attorney's and accounting fees. The court determines that Modes' financial performance over the last few years reflects little better than a "break-even" position. In point of fact, Burch testified that Modes generated no net cash flow *at all* during the past six years. Thus, even after factoring in defendants' average annual expenditure for attorney's fees, and assuming that Modes' bottom line were thereby to improve by $40,000 per year, the company still could not generate profits of the same magnitude as it did during 1984.[8] Additionally, it bears repetition that the Government adduced no evidence of its own to show that Modes' financial condition would return to its earlier strength in the near future. The court concludes that, in the absence of an unexpected, dramatic improvement in Modes' financial performance, Modes will not be able to generate sufficient revenues to support the payment of civil penalties in the hundreds of thousands of dollars.

In brief, the court finds that a penalty even approaching the very large sums requested by the Government would be far beyond defendants' ability to pay.

### *Discussion*

#### I.

■ The relevant statutory provision relating to the imposition of a penalty for fraudulent violations of section 1592 states, in pertinent part:

**(c) Maximum penalties.—**

(1) **Fraud.—**A fraudulent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed the domestic value of the merchandise.

19 U.S.C. § 1592(c) (1988). The parties have stipulated that the domestic value of the merchandise in this case is $2,325,000. Review of the penalty is *de novo.* 19 U.S.C. § 1592(e)(1).

■ The plain language of the statute establishes only a *maximum* penalty, but makes no provision for a minimum penalty. Nothing in the statute precludes the court from awarding a penalty of zero in the event that mitigating factors justify such a judgment. Additionally, the statute does not require the court to proceed from a maximum penalty and reduce that amount in the light of mitigating factors, an assumption that appears to be implicit in the Government's argument and which the court rejects. Nor is the court's discretion limited by the penalty assessed by Customs pursuant to its regulatory mitigation guidelines. *See United States v. Priority Prod., Inc.,* 9 CIT 383, 386, 615 F.Supp. 591, 593 (1985).

Very few published decisions arising under section 1592 address the issue of *quantum.* It is settled, however, that the court possesses the discretion to determine a penalty within the parameters set by the statute. *See United States v. Valley Steel Prod. Co.,* 14 CIT 14, 17, 729 F.Supp. 1356, 1359 (1990). Because the statute does not enumerate specific factors to guide the exercise of that discretion, the court refers to sources of law outside the statute for instruction.

#### II.

■ In the absence of explicit statutory mitigation factors, the court is guided by provisions in other statutes relating to the discretionary imposition of civil penalties. *See Federal Election Comm'n v. Furgatch,* 869 F.2d 1256, 1258 (9th Cir.1989). A representative sampling of such penalty statutes[9]

---

8. Budhrani testified that Modes generated profits of approximately $200,000 in 1984, which was the year in which the corporation did most of its importing.

9. *See, e.g.,* Flammable Fabrics Act, § 115(c), 15 U.S.C. § 1194(e); Water Quality Act of 1987, § 313(c), 33 U.S.C. § 1319(d) (1988); Federal Pesticides Act of 1978, § 17(4), 7 U.S.C. § 1361(a)(4) (1988); Financial Institutions Reform, Recovery and Enforcement Act of 1989,

suggests the following nonexclusive list of possible mitigation factors in the context of section 1592:

(1) the defendant's good faith effort to comply with the statute;

(2) the history of previous violations;

(3) the nature and circumstances of the violation at issue;

(4) the degree of harm to the public;

(5) the defendant's ability to pay;

(6) the appropriateness of the penalty to the size of the defendant's business and the effect of the penalty on the defendant's ability to continue in business;

(7) the economic benefit to defendants of the violation;

(8) the value of vindicating agency authority;

(9) the gravity of the violation; and

(10) such other matters as justice may require.

See also United States v. Ven–Fuel, Inc., 758 F.2d 741 (1st Cir.1985) (earlier version of section 1592).[10] The following discussion applies the relevant factors to the case at bar.

### 1. Defendants' Good Faith. [11]

 To begin with, it is undeniable that Budhrani intentionally submitted false invoices to Customs and lied to Owens about the discrepancy in invoices, although he expressed remorse at trial. It is undisputed, however, that Budhrani discontinued the double invoicing system immediately upon being advised by legal counsel of the scope of the violation. Moreover, once Budhrani had exhausted all avenues to remedy Customs' deplorable seizure of his attorney's files, he produced all documents that had been the subject of the administrative summonses.

Although Budhrani's repeated false statements were objectionable, he did not display bad faith merely by virtue of his vigorous pursuit of pre-trial remedies, as the Government argues. The good faith factor, therefore, favors the Government, but not decisively.

### 2. Prior Violations.

There is no history of prior violations by defendants of the Customs laws. This factor, consequently, favors defendants.

### 3. Degree of Culpability.

Moving to the nature of the offense and Budhrani's relative culpability, the court considers that this factor militates toward a low penalty. Although the court has found that Budhrani knew that falsification of invoices was illegal and that the entire double invoicing system was likewise illegal, the court also has determined that Budhrani was unaware of the GSP program and was further unaware that his false statements would impact GSP calculation or have any other adverse impact upon the administration of the Customs laws. The object of his scheme was to assist the shipper in avoiding Taiwanese income tax: an exercise in moral turpitude, to be sure, but not a violation of American law per se. Simply put, Budhrani had neither the knowledge that his act would injure our Government nor the intent to cause the Government to rely detrimentally upon his false statement. The short of the matter is that Budhrani did not fully appreciate the consequence and nuance of his lie. Thus, although the false invoicing system satisfied the regulatory definition of fraud, see 19 C.F.R. Pt. 171, App. B(B)(3) (1984), the true character of Budhrani's motives and his mental culpa-

---

§ 907(a), 12 U.S.C. § 1818 (i)(2)(G) (1988); Federal Coal Mine Health and Safety Act, § 201, 30 U.S.C. § 820(i) (1988); Clean Air Act, § 701, 42 U.S.C. § 7413(e) (1988); Toxic Substances Control Act, § 16, 15 U.S.C. § 2615(a)(2)(B) (1988); Hazardous Materials Transportation in Uniform Safety Act of 1990, § 12, 49 U.S.C. § 1809(a)(1) (1988).

**10.** In Ven–Fuel, the First Circuit considered: (1) the character of the defendant's offense (negligence); (2) the public interest in compliance with the regulations involved (national security);

and (3) the benefit that defendants had obtained from the violation in question. Id. at 764–65. The Government also refers to Customs' own mitigation guidelines, 19 C.F.R. Pt. 171, App. B(F) (1991), which overlap to some extent with the above list.

**11.** Statutory mitigation factors do not typically invite the "clean hands" argument that defendants raise concerning Customs' unlawful seizure of Mr. Wilson's files. Fortunately for plaintiff, therefore, the court does not here reach the issue of the Government's good faith.

bility was of a lesser degree than is typically associated with fraud.

#### 4. *Harm to the Public and Vindication of Agency Authority.*

Factors relating to the harm suffered by the Government and the public interest in vindicating agency authority strongly favor the Government. The public interest in truthful and accurate submission of documentation to Customs is what is ultimately at stake in this case. "[T]he purpose of section 1592 was 'to encourage accurate completion of the entry documents upon which Customs must rely to assess duties and administer other customs law.'" *United States v. F.A.G. Bearings, Ltd.*, 8 CIT 294, 296, 598 F.Supp. 401, 403–04 (1984) (citing S.Rep. No. 778, 95th Cong., 2d Sess. 17, *reprinted in* 1978 U.S.C.C.A.N. 2211, 2229). Moreover, the court acknowledges that, if every importer were to conspire with his shipper to declare false value information in Customs invoices, the integrity of the GSP program would be irreparably damaged. That program exists to assist certain industries in developing nations to become competitive with those of the major industrialized nations, not to confer generous bounties upon private parties beyond the point where such assistance is justified. Although Budhrani's private arrangement with Chou did not result in the perpetuation of duty-free treatment for Taiwanese twist beads, it had the potential to accomplish that result at the time, and in any event, it did result in the transmission of inaccurate value information to Customs. These factors alone compel the court to the conclusion that a penalty of some substance must be levied.

 The harm to the Government extended beyond mere statistical distortion. The cost of investigating and prosecuting this action is an independent harm to the Government and should be considered in the selection of a penalty. *See Valley Steel*, 14 CIT at 17, 729 F.Supp. at 1359–60 (remedial scheme of section 1592 affords "liquidated" damages to remedy costs of investigating and prosecuting); *United States v. Alcatex, Inc.*, 328 F.Supp. 129 (S.D.N.Y.1971). Although the court does not require defendants to pay the entire amount of the cost incurred by the Government, it is entirely reasonable that they assume responsibility for the consequences of their wrongdoing.

#### 5. *Defendant's Ability to Pay and Remain in Business.*

 The ability of defendants to pay is ultimately an issue of fact, concerning which only defendants submitted any valuable evidence. The long and the short of the matter is that defendants could not pay a penalty of more than $100,000 without either destroying Modes or imposing a serious hardship upon Budhrani and his family. Although the court agrees with the Government that defendants' ability to pay need not necessarily constitute a ceiling of liability, the Government has failed to satisfy the court that the facts of this case justify a penalty in excess of that amount.

Another perspective to consider is the relation of the amount of the penalty to the size of the corporation, with particular regard to defendants' ability to continue in business while paying the judgment. As already discussed, Modes will not generate sufficient income to sustain any figure close to $2,325,000 in penalties. Moreover, at this juncture the court rejects the Government's suggestion that defendants draw on Modes' assets to satisfy the judgment; sale of Modes' inventory and other assets would only serve to reduce the volume of sales, and quite possibly destroy the company.

#### 6. *Benefits Derived From Defendants' Violation.*

Finally, the list of mitigating factors includes the issue of whether defendants derived any benefit by virtue of their violation. This factor unequivocally favors defendants. To put the matter bluntly, defendants did not materially benefit from the double invoicing system in any way. The goods in question were entered duty-free. Consequently, Budhrani realized no savings in the form of duty that otherwise would have been required to be paid, and the Government was not deprived of any duty as a consequence of the false valuation.

Although it is true that Budhrani's agreement to comply with the double invoicing system facilitated his transaction of business with Chou, Budhrani also gave uncontroverted testimony at trial that the same twist beads could have been imported through any number of shippers. (R. at 55). In a word, then, defendants derived no tangible benefit from the double invoicing system beyond that which they would have received if the true values had been entered on the invoices submitted to Customs.

In closing statements, the Government proposed that the mere fact that the United States was not deprived of any duty should not be accorded great weight as a mitigating factor. In support for this line of argumentation, the Government quoted the statute itself, which provides that defendants may be held liable for false invoicing "without regard to whether the United States is or may be deprived of all or a portion of any lawful duty." 19 U.S.C. § 1592(a)(1). This argument is misleading. The statutory language upon which the Government relies runs to the issue of liability, not to the entirely separate issue of mitigation. The Government's theory is also counterintuitive: if the treasury had actually been deprived of revenues by defendants' double invoicing system, the balance of mitigation factors would indicate a higher penalty than in this case. Since GSP eligibility was withdrawn anyway, the issue of false price information was generally academic.

### III.

The above factors are not an exhaustive list. More generally, in the First Circuit case of *United States v. Ven–Fuel, supra,* the panel majority evaluated the district court's award within a broader set of considerations. Principally, the *Ven–Fuel* court was concerned that the penalty should be within fair proportion to the offense that had been committed, and not otherwise shocking to the conscience of the court. 758 F.2d at 765.

Inasmuch as the Government was not deprived of revenue by defendants' double invoicing scheme, and such was never defendants' intention, the court believes that a penalty anywhere near the maximum would be grossly disproportionate to defendants' offense.[12]

Balancing all the factors enumerated herein, the court concludes that the interests of justice demand a relatively lenient penalty. True, the Government incurred expenses in prosecuting this action, and the public interest in accurate submission of information is not to be minimized. However, defendants did not gain anything dollar-wise from their violation and had never committed any prior violations.. Additionally, defendants' culpability was qualitatively lower than that of other violators of the same statute. Finally, the draconian penalties that the Government seeks would certainly destroy defendants, and would be utterly disproportionate to the character of their offense.

### IV.

■ Since it has been determined that the penalty will be a moderate one, the court considers the Government's "fallback" position. Specifically, the Government proposes that a penalty for fraud should be "reduced," if at all, to an amount no lower than the maximum penalty for gross negligence, i.e., the next lowest level of culpability. Under the Government's construction, any lower penalty would be contrary to the scheme of the statute. This argument is erroneous and may be disposed of quickly. First, as the court has already emphasized, the statute does not provide a minimum penalty for any of the three possible violations of section 1592. Moreover, it is the Government's proposed construction that is contrary to the statutory scheme, in that section 1592(e) provides for trial *de novo,* committing the final decision as to the penalty to the discretion of the court. *See also, Ven–Fuel,* 758 F.2d at

---

12. It is noteworthy that one of the purposes of the Customs Procedural Reform and Simplification Act of 1978 was to address the harshness of the penalties then existing under the predecessor to section 1592 by relating the amount of the penalty to the culpability of the offender. *See*

S.Rep. No. 778, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2211–14 (cited in Kevin C. Kennedy, *Civil Penalty Proceedings Under Section 592 of the Tariff Act of 1930,* 10 Fordham Int'l L.J. 147, 148 (1986–7).

765; *Valley Steel,* 14 CIT at 17, 729 F.Supp. at 1359.

The court's skepticism of the Government's proposed construction of the statute is further amplified by consideration of the recent case of *United States v. Thorson Chemical Corp.,* 16 CIT ——, 795 F.Supp. 1190 (1992). In *Thorson,* the court found that the defendants had committed fraudulent violations of section 1592 by means of a double invoicing system, and dismissed as incredible Thorson's testimony that the undisclosed invoices represented a scheme by which to assist its German affiliate to obtain favorable credit terms at home. *Id.* 795 F.Supp. at 1197. In this latter respect, *Thorson* is distinguishable from the case at bar, in which the court is satisfied with defendants' explanation of the object of their double invoicing scheme. Significantly, the chemical products in *Thorson* were dutiable, and the undervaluation of the chemicals resulted in an underpayment of duty to Customs.

■ Although the court in *Thorson* found fraud, compounded by testimony that it characterized as "less than credible," the court assessed a penalty of $150,000, which was far below the domestic value of the merchandise in question, $2,402,695. *Id.* at 1199. Additionally, the Government itself had requested that modest penalty, rather than the maximum allowable by statute. *Id.* Although in *Thorson* the Government exercised its prosecutorial discretion to request a low penalty, and has requested a vast amount here, the court is not bound by the amounts recommended by the Justice Department in the exercise of its vaunted prosecutorial discretion. The court is also intrigued, to say the least, as to why a mild penalty in *Thorson* raised no burning issues of statutory construction in the collective mind of the Government, whereas in the instant case nothing less than the severest penalty will suffice. In any event, the court cannot escape the conclusion that the imposition of staggering penalties upon defendants, who never deprived the Government of any duty, would breed inconsistent results at best, and at worst, disproportionate penalties.

## Conclusion

The court stresses that false invoicing is a serious violation of the import laws. Under appropriate circumstances, this court possesses the discretion to award penalties up to the domestic value of the merchandise, with the possible consequence of destroying a business. While the court exercises restraint today, those involved in similar violations should take note that whosoever submits false documents to Customs does so at his own serious peril.

■ Having considered and weighed all factors relevant to the issue of mitigation, the court determines that $50,000 represents a just penalty under all the facts and circumstances in this case. The court accordingly grants judgment for plaintiff and assesses a civil penalty in the amount of $50,000, plus interest from the date of judgment.

So ordered.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED: that judgment is granted in favor of Plaintiff, and it is further

ORDERED, ADJUDGED, AND DECREED: that Plaintiff may recover against Defendants an assessed civil penalty in the amount of $50,000 (fifty thousand dollars), plus interest from the date of judgment, for fraudulent violations of 19 U.S.C. sec. 1592.

Case dismissed.

## AMENDED JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED: that judgment is granted in favor of Plaintiff, and it is further

ORDERED, ADJUDGED, AND DE-CREED: that Plaintiff may recover against Defendants an assessed civil penalty in the amount of $50,000 (fifty thousand dollars), plus interest from the date of judgment, for fraudulent violations of 19 U.S.C. § 1592.

This amended judgment supersedes the judgment entered on June 24, 1993 and is entered to delete the language, "Case dismissed" appearing at the close of the prior judgment.