**Slip Op. 99-132**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No.: 95-10-01319 |
| | : | |
| | : | |
| COMPLEX MACHINE WORKS CO., | : | |
| ANDRAS NYAKAS, ANDRAS NYAKAS | : | |
| D/B/A COMPLEX MACHINE WORKS | : | |
| CO. and ANDRAS H. NYAKAS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

[Following trial to determine proper amount of penalty under 19 U.S.C. § 1592, penalty of $400,000.00 imposed.]

Decided December 14, 1999

David Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Ming-Yuen Meyer-Fong, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, for Plaintiff.

Neville, Peterson & Williams (John M. Peterson and Curtiss W. Knauss) for Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter having come on for trial in New York, New York, on April 5, 1999, the

parties having submitted it for decision and judgment after completion of the trial on April 5,

1999, the Court having considered the Defendants' Post-Trial Brief On Penalty Assessment

("Defendant's Brief") submitted on May 3, 1999, Plaintiff's Post-Trial Brief ("Plaintiff's

Response") submitted on May 17, 1999 and the Joint Stipulations dated April 5, 1999, and

having given due consideration to the testimony of all witnesses, together with due consideration

of all stipulated facts and all evidence admitted at trial, and the Court having granted Plaintiff's

Motion for Partial Summary Judgment per Order dated February 23, 1999, now the Court,

pursuant to USCIT Rule 52(a), finds facts and sets forth its conclusions of law, and enters

Judgment for Plaintiff pursuant to these Findings of Fact and Conclusions of Law.


## FINDINGS OF FACT

Plaintiff, the United States Customs Service (hereinafter "Customs") filed this action on

October 17, 1995 to recover civil monetary penalties[1] under section 592 of the Trade Act, as

amended, 19 U.S.C. § 1592 (1988) with respect to 64 separate entries of machine parts into the

United States.

Defendant Andras Nyakas (hereinafter "Nyakas") was president of Defendant Complex

Machine Works Co. ("Complex"), a Canadian corporation, which imported machinery parts from

Canada into the United States.[2]  Defendant Andras H. Nyakas (hereinafter "Andras H."), the son

of Andras Nyakas, was employed by Complex.

On October 18, 1990, Senior Customs Inspector Dale Peterson ("Peterson") discovered

that Andras H. attempted to enter machine parts into the United States without paying duties, by

hiding those machine parts in the trunk of his car.  Pretrial Order at 2; Tr. at 38.  During the

inspection on October 18, 1990, in response to questioning by Peterson, Andras H. made false

statements about the contents of his automobile trunk, ownership of the automobile and how the

merchandise found its way into the trunk. Tr. at 38-43.  At that time, Customs seized the

merchandise, but later that day, Andras H. paid a mitigated penalty of $500 and Customs released

---

[1]        The Government recovered the lost duties in a parallel criminal action.

[2]        Complex filed for bankruptcy in 1991.  Pretrial Order at 2.  Defendant Nyakas
currently owns and operates Subco Engineering, Inc. ("Subco"), another Canadian corporation
which engages in the same type of business as Complex.  Pl. Exh. 9 at 12.

the merchandise.  Pretrial Order at 2; Tr. at 48; Pl. Exh. 1 at 32.

The smuggling incident prompted an investigation[3] led by Customs Agent Nathan Lavoie ("Lavoie") into other entries of merchandise into the United States by Complex.  Tr. at 54; Pretrial Order at 2-3.  Lavoie discovered that on 35 separate occasions, Defendants failed to submit properly valued invoices to Customs for merchandise entries.  Pretrial Order at 3.  In addition, on 29 separate occasions, Defendants entered merchandise into the United States destined to two customers, Alpha Tube and Sterling Pipe, and failed to declare them to Customs. Id.

In interviews with Lavoie and Peterson, Andras H. and Nyakas provided inconsistent and misleading answers regarding the number of employees working at Complex, and the extent of Defendants' compliance with the Customs laws on prior occasions.  Tr. at 38-42, 66, 68.

On November 4, 1992, the United States obtained a criminal indictment against Nyakas for 24 counts of violating 18 U.S.C. § 1001 (false statements) and 25 counts of violating 18 U.S.C. § 545 (smuggling).  Pl. Exh. 2 at 1-4.  Nyakas and Andras H. were also indicted for one count of smuggling.  Pl. Exh. 2 at 4.  Both Nyakas and Andras H. pled guilty to those charges. Pretrial Order at 3, 4; Pl. Exh. 3.

On December 31, 1992, Customs issued a pre-penalty notice to Defendants and gave them an opportunity to submit information to Customs for mitigation.  Defendants did not respond.  On October 17, 1995, Customs filed a Summons and Complaint in this Court for collection of civil penalties for these violations.

By Order dated August 23, 1996, the Court denied Defendants' motion to dismiss,

---

[3]        During his investigation of these violations, Lavoie expended approximately 1,450 hours investigating the case.  Tr. at 69-70.

rejecting their Statute of Limitations and Double Jeopardy arguments.   United States v. Complex

Machine Works Co., 937 F. Supp. 943, 945 (CIT 1996). On August 23, 1996, the Court entered

an Order denying Defendants' Motion To Dismiss Plaintiff's Complaint.  On March 31, 1998,

Plaintiff filed a Motion For Partial Summary Judgment seeking liability as to all but a few of the

entries allegedly fraudulently made by Defendants.

On June 25, 1998, in light of representations by counsel for Defendants, the Court entered

an Order memorializing those representations and specifically holding that:

> . . . settlement, if any, shall be completed and the appropriate paperwork filed with
> the Court on or before August 25, 1998; and [that] if no settlement is reached
> Defendant's Response to Plaintiff's Motion . . . if any, shall be filed on or before
> August 25, 1998; and [that] if no settlement is reached and Defendant has not
> filed a Response to Plaintiff's Motion For Partial Summary Judgment, the Court
> will grant Plaintiff's Motion for Partial Summary Judgment sua sponte and
> without further notice.

Thereafter, the parties requested and received a number of additional extensions of time within

which to seek to settle this case.  During several status conferences held during that period, the

Court specifically reminded Defendants' counsel that the June 25, 1998 Order was still in effect,

and that Defendants would not be permitted to file any Response to Plaintiff's pending Motion if

settlement was not reached.

On February 23, 1999, the parties informed the Court that they had reached an impasse

regarding settlement. The Court entered an Order granting Plaintiff's pending motion for

summary judgment, specifically finding that:

> . . . Defendants fraudulently violated 19 U.S.C. §1592(a) with respect to the 49
> entries described in exhibit 1 attached to Plaintiff's Memorandum in Support of
> Its Motion For Partial Summary Judgment . . . .

The Order covered Entries 1-25 of Exhibit A and Entries 1-24 of Exhibit B attached to Plaintiff's

Complaint.[4]

_____

⁴       Entries 1-25 of Exhibit A are violations for the use of false documents and include:

| | Entry Number | Date | Declared Value | True Value |
|---|---|---|---|---|
| 1. | G170018047-5 | 04/20/91 | $2,401.00 | $13,108.00 |
| 2. | G170017991-5 | 03/11/91 | 3,182.00 | 13,657.00 |
| 3. | G170017882-1 | 11/23/90 | 1,605.00 | 4,797.00 |
| 4. | G170017833-9 | 11/23/90 | 1,721.00 | 6,447.00 |
| 5. | G170017726-5 | 09/05/90 | 3,091.00 | 17,096.00 |
| 6. | G170017674-7 | 07/18/90 | 3,179.00 | 16,441.00 |
| 7. | G170017620-0 | 06/01/90 | 3,720.00 | 24,776.00 |
| 8. | G170017545-9 | 05/10/90 | 3,232.00 | 4,500.00 |
| 9. | G170017521-0 | 05/04/90 | 1,570.00 | 9,628.00 |
| 10. | G170017502-2 | 05/01/90 | 1,616.00 | 7,772.00 |
| 11. | G170017370-2 | 03/13/90 | 4,242.00 | 35,898.00 |
| 12. | G170017067-4 | 01/03/90 | 4,948.00 | 28,760.00 |
| 13. | G170016678-9 | 09/14/89 | 1,919.00 | 10,255.00 |
| 14. | G170016553-4 | 07/31/89 | 3,703.00 | 9,830.00 |
| 15. | G170016508-8 | 07/06/89 | 1,733.00 | 8,850.00 |
| 16. | G170016374-5 | 06/13/89 | 1,496.00 | 7,269.00 |
| 17. | G170016173-1 | 05/22/89 | 3,592.00 | 16,926.00 |
| 18. | G170011845-9 | 03/31/89 | 3,403.00 | 19,130.00 |
| 19. | G170011510-9 | 12/27/88 | 3,235.00 | 22,209.00 |
| 20. | G170011276-7 | 10/04/88 | 3,578.00 | 18,775.00 |
| 21. | G170011197-5 | 09/01/88 | 7,984.00 | 42,666.00 |
| 22. | 1121857926-3 | 06/27/88 | 3,511.00 | 12,682.00 |
| 23. | 1121801341-2 | 03/22/88 | 2,640.00 | 18,207.00 |
| 24. | 1121769318-0 | 02/18/88 | 3,037.00 | 16,338.00 |
| 25. | 1121755462-2 | 12/10/87 | 2,630.00 | 19,705.00 |

The 24 Entries of smuggled merchandise listed in Exhibit B are:

| | Date | Invoice Number | True Value |
|---|---|---|---|
| 1. | 02/28/91 | 029101 | $2,250.00 |
| 2. | 02/28/91 | 029102 | 3,450.00 |
| 3. | 10/20/90 | 1232 | 1,078.00 |
| 4. | 09/20/90 | 1245 | 4,445.00 |
| 5. | 09/14/90 | 1158 | 1,710.00 |
| 6. | 02/28/89 | 1393 | 3,000.00 |

Following the Court's determination of partial liability, the parties then stipulated that

Defendants Complex and Andras Nyakas, by intentional fraud, violated 19 U.S.C. § 1592 in

connection with Entries 26-35 of Exhibit A to the Complaint, and Entries 25-29 of Exhibit B.[5]

| | | | |
|---|---|---|---|
| 7. | 02/16/89 | 1194 | 4,500.00 |
| 8. | 02/06/89 | 1392 | 5,250.00 |
| 9. | 12/27/88 | 1354 | 1,975.00 |
| 10. | 12/27/88 | 1353 | 1,350.00 |
| 11. | 12/27/88 | 1351 | 1,375.00 |
| 12. | 12/27/88 | 1348 | 1,450.00 |
| 13. | 12/22/88 | 1346 | 2,340.00 |
| 14. | 10/08/88 | 1186 | 616.00 |
| 15. | 05/19/88 | 1285 | 1,285.00 |
| 16. | 05/19/88 | 1289 | 690.00 |
| 17. | 05/19/88 | 1283 | 840.00 |
| 18. | 05/18/88 | 1302 | 4,450.00 |
| 19. | 05/18/88 | 1258 | 2,960.00 |
| 20. | 05/17/88 | 1183 | 3,325.00 |
| 21. | 05/17/88 | 1114 | 3,300.00 |
| 22. | 05/16/88 | 1060 | 2,050.00 |
| 23. | 05/12/88 | 1288 | 1,316.00 |
| 24. | 05/12/88 | 1291 | 4,272.00 |

[5]    The 10 entries listed in Exhibit A are:

| | Invoice Number | Date | Declared Value | True Value |
|---|---|---|---|---|
| 1. | 1120876838-9 | 10/01/87 | $2,325.00 | $19,587.00 |
| 2. | 1120858953-8 | 08/21/87 | 1,804.00 | 17,385.00 |
| 3. | 1120852868-4 | 07/22/87 | 1,184.00 | 5,945.00 |
| 4. | 1120835155-8 | 05/26/87 | 7,370.00 | 29,454.00 |
| 5. | 1120269625-5 | 03/09/87 | 4,151.00 | 36,330.00 |
| 6. | 1120256440-4 | 02/10/87 | 1,341.00 | 7,065.00 |
| 7. | 20186690507 | 09/17/86 | 2,180.00 | 13,300.00 |
| 8. | 20186686762 | 08/28/86 | 2,601.00 | 11,575.00 |
| 9. | 20186680206 | 07/24/86 | 1,427.00 | 8,667.00 |
| 10. | 20186674100 | 06/24/86 | 3,087.00 | 14,842.00 |

Under the terms of that Stipulation, Plaintiff does not seek a final judgment against Defendant Andras H. as to these Entries.  However, Andras H. remains liable for the Entries covered by the Court's earlier grant of partial summary judgment and Plaintiff seeks to recover a monetary penalty against Andras H. for these Entries.

At trial, the parties stipulated that the total domestic true value of the merchandise covered by Entries 1-25 of Exhibit A and Entries 1-24 of Exhibit B is $499,547.00, and that the total domestic true value of the merchandise covered by Entries 26-35 of Exhibit A and Entries 25-29 of  Exhibit B is $187,222.00.  Plaintiff seeks the maximum penalty allowed under 19 U.S.C. 1592 for these violations, for a total of $686,769.00.   Defendants have paid no part of the penalties demanded by Customs.

At trial, Defendants called no witnesses, but submitted into evidence their tax returns and unaudited financial statements, asserting an inability to pay the maximum penalty sought by Plaintiff.  Defendants seek a penalty of less than $30,000.00.

---

The five entries listed in Exhibit B are:

|   | Date | Invoice Number | True Value |
|---|------|----------------|------------|
| 1. | 05/08/87 | 1209 | $1,570.00 |
| 2. | 04/07/87 | 1208 | 5,630.00 |
| 3. | 12/18/86 | 1206 | 5,680.00 |
| 4. | 09/30/86 | 1166 | 5,232.00 |
| 5. | 09/30/86 | 1165 | 3,825.00 |

## CONCLUSIONS OF LAW

### A

### The Standards Governing Penalties
### Under § 1592 Need To Be Clarified

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581.  The only issue before the Court is the amount of the penalty due under 19 U.S.C. §1592.  19 U.S.C. §1592(a)(1) states:

> Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee thereby, no person, by fraud, gross negligence, or negligence–
>
> (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of--
> (i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or
> (ii) any omission which is material . . . .

In actions brought for the recovery of any monetary penalty claimed under 19 U.S.C. §1592, all issues are tried de novo, including the amount of the penalty.  19 U.S.C. § 1592(e)(1).  "[T]he law requires the court to begin its reasoning on a clean state.  It does not start from any presumption that the maximum penalty is the most appropriate or that the penalty assessed or sought by the government has any special weight."  United States v. Menard, Inc., 17 CIT 1229, 1229, 838 F. Supp. 615, 616 (1993), aff'd in part, vacated and remanded in part on other grounds, 64 F.3d 678 (Fed. Cir. 1995).  The maximum penalty for a fraudulent violation of §1592  is "an amount not to exceed the domestic value of the merchandise."  19 U.S.C. §1592(c).

Prior to the enactment of the Customs Procedural Reform and Simplification Act of 1978 ("Customs Reform Act"), monetary penalties under §1592 were imposed without regard to the

degree of culpability. The statute required forfeiture of the merchandise itself, or payment of a fine equal to its domestic value. See S. Rep. No. 778, pt. 10, reprinted in 1978 U.S.C.C.A.N. 2211. The Court had no authority to vary the amount of the statutory penalty. Id.

With passage of the Customs Reform Act, "[t]he monetary penalty [was] changed from a fixed amount, the domestic value of the goods, to an amount varying according to the culpability of the importer." Id..[6] For the first time, "the appropriateness of the amount of the penalty [became] a proper subject for judicial review." Id.; see United States v. Modes, Inc., 17 CIT 627, 635, 826 F. Supp. 504, 512 (1993) ("It is settled . . . that the court possesses the discretion to determine a penalty within the parameters set by the statute."). Thus, by statutory direction, the Court must now consider the degree of culpability of the defendant in making its penalty determination. See United States v. Thorson Chemical Corp., 16 CIT 441, 452, 795 F. Supp. 1190, 1199 (1992) ("The degree of culpability is a relevant factor for the Court in assessing a penalty under section 1592.").

Although Congress amended the penalty statute to account for different levels of culpability and penalty amounts, the statute and legislative history fail to enumerate any factors, either mitigating or aggravating, to be applied by a court making a penalty determination.[7] In contrast, other federal statutes providing for discretionary imposition of civil penalties set forth

---

[6]     The amended provisions of §1592 provide for a penalty for fraudulent violations of the statute "not to exceed the domestic value of the merchandise." §1592(c)(1). Section 1592 imposes lesser penalties for two other degrees of culpability, gross negligence and negligence. See §§1592(c)(2) and (c)(3).

[7]     "Although 'a defendant in a section 1592 action may be forced to pay the greatest penalty applicable under that provision even if his unlawful conduct did not result in any loss of revenue to the United States . . . the legislative history makes clear that an important motivation for amending section 1592 was Congress' desire to alleviate the harsh consequences of the forfeiture penalty.'" United States v. Snuggles, Inc., 937 F. Supp. 923, 927 (CIT 1996) (citation omitted).

specific factors to guide the decisionmaker in the determination of the proper penalty amount.

See e.g., the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30165(c) (1994)

(requiring court to consider "the size of the business of the person charged and the gravity of the

violation); the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(a)(3)

(1986); the Clean Water Act, 33 U.S.C. § 1319(d) (1990) (requiring court to consider, *inter alia*,

seriousness of the violation, economic benefit, history of violations, good faith efforts to comply,

and economic impact of the penalty); see also United States v. Anthony Dell'Aquilla Enterprises,

150 F.3d 329, 339  (3d Cir. 1998) (vacating and remanding penalty amount to district court for

failure to consider mitigating factor of ability to pay).

In Modes, the Court looked to these and other discretionary penalty statutes,[8] and

decisions assessing penalties under those statutes, as the basis for a list of factors which could be

applied by a court in § 1592 cases.[9]  The Court held that "[a] representative sampling[10] of such

---

[8]         Modes cited Federal Election Comm'n v. Furgatch, 869 F.2d 1256, 1256 (9th Cir.
1989) for the proposition that where explicit statutory mitigation factors are lacking ". . . the
court is guided by provisions in other statutes relating to the discretionary imposition of civil
penalties." 826 F. Supp. at 512.  This Court accepts the proposition as useful for the reasons set
forth herein, but, of course, recognizes that it is not bound by such authority.  Algoma Steel
Corporation v. U.S., 865 F.2d 140, 243 (Fed. Cir. 1989).

[9]         Other courts have used a "top-down" or, in some cases, a "bottom-up" method of
calculation in determining civil penalties under the Clean Air Act, the Clean Water Act and
RCRA.  See, e.g., United States v. Gulf Park Water Co., 14 F. Supp. 2d 854, 858 (S.D. Miss.
1998) (listing representative cases applying each method).  Under the former method, the
statutory maximum provides the presumptive penalty amount, which is adjusted downward in
light of any mitigating factors.  The Modes court rejected this method, noting that it is "not
required" by the terms of § 1592. 17 CIT at 635, 826 F. Supp. at 512.  Under the latter method,
the presumptive penalty is zero, and is augmented in light of aggravating factors.  This Court has
not located any instances in which a "top-down" or "bottom-up" method has been applied in
determining a penalty under § 1592, and declines to adopt such an approach.  Moreover, the
Court notes that a top-down approach does not allow for the increase of a penalty in light of
those among the listed factors which take into account aggravating circumstances, while a
"bottom-up" approach is subject to similar infirmities.

penalty statutes" suggested a "non-exclusive list of possible mitigation factors in the context of

section 1592."  Those factors  were:

1.      the defendant's good faith effort to comply with the statute,

2.      the history of previous violations,

3.      the nature and circumstances of the violation at issue,

4.      the degree of harm to the public,

5.      the defendant's ability to pay,

6.      the appropriateness of the penalty to the size of the defendant's business

         and the effect of the penalty on the defendant's ability to continue in

         business,

7.      the economic benefit to the defendant of the violation,

8.      the value of vindicating the agency authority,

9.      the gravity of the violation, and

10.     such other matters as justice may require.

Although the Modes opinion implied that each of the ten factors appeared somewhere in

the cited statutes, it appears that the Court derived some of the enumerated factors from other

---

The Modes court also declined to limit its analysis to the list of mitigating and aggravating factors identified by Customs at 19 CFR § 171, Appendix B(F) and (G) (1999). Modes, 17 CIT at 635-36, 826 F. Supp. at 512 ("Nor is the court's discretion limited by the penalty assessed by Customs pursuant to its regulatory mitigation guidelines.").  Those factors provide for mitigation where there is evidence of:  1) contributory Customs error, 2) cooperation with the investigation, 3) immediate remedial action, 4) inexperience in importing or 5) prior good record.  Customs' factors provide for aggravation where a defendant has obstructed the investigation, withheld evidence, or provided misleading information.

[10]     That sampling included:  the Flammable Fabrics Act, 15 U.S.C. 1194(e)(2) and (3) (1990), the Clean Water Act, 33 U.S.C. 1319(d) (1990), the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. 136(l)(a)(4) (1991), the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. 1818(i)(2) (1998), the Federal Mine Safety and Health Act, 30 U.S.C. 820(i) (1990), the Clean Air Act, 42 U.S.C. 7413(e) (1990), the Toxic Substances Control Act, 15 U.S.C. 2615(a)(2)(B) (1992), and the  Hazardous Materials Transportation in Uniform Safety Act, 49 U.S.C. 5123 (1994) (formerly 49 U.S.C. 1809(a)(1)).

statutes or from uncited decisions.  The <u>Modes</u> Court also referenced, but did not apply,

additional unenumerated considerations, which it derived from the First Circuit's decision in

<u>United States v. Ven-Fuel, Inc.</u>, 758 F.2d 741 (1st Cir. 1985) (applying earlier version of § 1592).

Those factors included:

1.     the character of the defendant's offense;

2.     the nature of the public interest in ensuring compliance with the regulations involved;

3.     proportionality of the penalty to the offense; and

4.     that the penalty not otherwise be shocking to the conscience of the Court.

See <u>Modes</u>, 17 CIT at 636 n. 10 and 639, 826 F. Supp. at 513 n.10 and 515 (citing <u>Ven-Fuel</u>).

Unfortunately, after enumerating these factors, the <u>Modes</u> court did not explicitly

articulate its application of the factors to the facts before it.[11]  This omission leaves the Court

without significant guidance as to the proper application of those factors to the instant case.

In this opinion, we attempt to put flesh on the skeletal factors set forth in <u>Modes</u>.  To this

end, we have surveyed all comparable federal statutes that this Court has been able to locate in

order to articulate a more comprehensive list of relevant factors.  We now apply these factors to

analysis of cases arising under § 1592(c).  Such a principled analytical framework seems to the

Court a useful basis for resolution of the case before it, for evaluation of future cases, and for that

predictability of results by parties contemplating action which is the essence of our legal system.

This Court has identified numerous federal laws, in addition to the statutes cited in

---

[11]     The <u>Modes</u> court discussed the enumerated factors of the defendant's good faith, its history of violations, the nature of the offense, the extent of the defendant's culpability, the degree of harm to the public, the vindication of agency authority, the defendant's ability to pay, the defendant's ability to remain in business, and benefit to the defendant of the violation.  It also discussed the relationship of the penalty to the size of the business, and the nature of the public interest in enforcement of the regulations involved; those factors appear to have derived from the <u>Ven-Fuel</u> decision.

Modes,  which articulate factors relevant to a determination of civil penalties.[12]  The Court has

distilled, from these statutes and those cited by the Modes court as well as from the Ven-Fuel

decision, fourteen factors relevant to the imposition of civil penalties.  Those include:

1.      the defendant's good faith effort to comply with the statute,

2.      the defendant's degree of culpability,

3.      the defendant's history of previous violations,

---

[12]      The Court has located the following acts which set forth criteria for consideration in connection with the imposition of civil penalties:  the Swine Health Protection Act, 7 U.S.C. 3805(a) (1980); the Horse Protection Act, 15 U.S.C. 1825(b)(1) (1976); the Asbestos Hazard Emergency Response Act of 1986, 15 U.S.C. 2647(c) (1990); the Fastener Quality Act, 15 U.S.C. 5408(b)(2) (1999); the Northern Pacific Halibut Act of 1982, 16 U.S.C. 773f(a) (1982); the South Pacific Tuna Fishing Act, 16 U.S.C. 973f(a) (1988); the Fishery Conservation and Management Act, 16 U.S.C. 1858(a) (1996); the Antarctic Marine Living Resources Convention, 16 U.S.C. 2437(a)(1) (1984); the Lacey Act, 16 U.S.C. 3373(a)(6) (1996); the Federal Cave Resources Protection Act, 16 U.S.C. 4307(a)(1) (1988); the North Pacific Anadromous Stocks Convention, 16 U.S.C. 5010(a)(1) (1992); the High Seas Fishing Compliance Act, 16 U.S.C. 5507(a)(1), (b)(2) (1995); the Enforcement of the Communications Assistance for Law Enforcement Act, 18 U.S.C. 2522(c)(2) (1994); the National Education Reform Act, 20 U.S.C. 6083(f)(3) (1994); the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 333(f)(3)(B) (1996); the Egg Products Inspection Act, 21 U.S.C. 1041(c)(1)(C)(i) (1996); the Chemical Weapons Convention Implementation Act, 22 U.S.C. 6761(a)(2)(D) (1998); the Prevention of Pollution From Ships Act, 33 U.S.C. 1908(b)(2) (1996); the Organotin Antifouling Paint Control Act, 33 U.S.C. 2409(a)(2) (1988); the Shore Protection From Municipal or Commercial Waste Act, 33 U.S.C. 2608(a) (1988); the Oil Pollution Liability and Compensation Act, 33 U.S.C. 2716a(a) (1990); the Nonmailable Matter Act, 39 U.S.C. 3012(b)(2) (1983); the Atomic Energy Act, 42 U.S.C. 2282a(b)(2) (1992); the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(a)(3) (1986); the Ocean Thermal Energy Conversion Act, 42 U.S.C. 9152(c)(1) (1984); the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA), 42 U.S.C. 11045(b)(1)(C) (1986); the Americans with Disabilities Act, 42 U.S.C. 12188(b)(5) (1990); the Public Health and Welfare Act, Management of Rechargeable Batteries and Batteries Containing Mercury, 42 U.S.C. 14304(c) (1996); the Vessels and Seamen Act, 46 U.S.C. 2107(a) (1983); the International Ocean Commerce Transportation Act, 46 App. U.S.C. 1712(c) (1998); the Department of Transportation Act, 49 U.S.C. 336 (1989)(a), 49 U.S.C. 521(b)(2) (1998); the Motor Carriers, Water Carriers, Brokers and Freight Forwarders Act, 49 U.S.C. 14901(c) (1995); the Railway Safety Act, 49 U.S.C. 21301(a)(3) (1996); the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. 30165(c) (1994); the Commercial Motor Vehicle Safety Act (transporting passengers), 49 U.S.C. 31138(d)(2) (1995); the Commercial Motor Vehicle Safety Act (transporting property), 49 U.S.C. 31139(f)(2) (1995); the Motor Vehicle Information and Cost Savings Act, 49 U.S.C. 32709(a)(3) (1994); the Federal Aviation Act, 49 U.S.C. 46301(e) (1997); and the Pipeline Safety Act, 49 U.S.C. 60122(b) (1994).

4.      the nature of the public interest in ensuring compliance with the regulations involved,

5.      the nature and circumstances of the violation at issue,

6.      the gravity of the violation,

7.      the defendant's ability to pay,

8.      the appropriateness of the size of the penalty to the defendant's business and the effect of a penalty on the defendant's ability to continue doing business,

9.      that the penalty not otherwise be shocking to the conscience of the Court,

10.     the economic benefit gained by the defendant through the violation,

11.     the degree of harm to the public,

12.     the value of vindicating the agency authority,[13]

13.     whether the party sought to be protected by the statute had been adequately compensated for the harm, and

14.     such other matters as justice may require.

As one commentator has noted, monetary penalties may serve one of two conceptually distinct purposes:  motivation of behavior and compensation for harm to society.  Colin S. Diver, The Assessment and Mitigation of Civil Money Penalties by Federal Administrative Agencies, 79 Colum. L. Rev. 1435, 1461 (1979).  It appears that § 1592 is driven primarily by considerations of deterrence rather than compensation, as the statute's maximum penalty for fraud would bear a reasonable relationship to societal harm only in a system of 100 per cent tariffs.[14]

---

[13]     This factor is commonly derived from opinions interpreting certain other civil penalty statutes which do not contain statutorily mandated factors.  See, e.g., United States v. Barkman, 784 F. Supp. 1181, 1189 (E.D. Pa. 1992) (determining proper penalty amount under CERCLA, 42 US.C. 9604); Furgatch, 869 F.2d at 1258 (determining penalty amount under the Federal Election Campaign Act).

[14]     That is to say, where in the case of fraud Congress sets the penalty at an amount "not to exceed the domestic value of the merchandise," 19 U.S.C. §1592, it is clearly motivated

For the most part, the factors identified above relate to deterrence.  Good faith effort to comply, degree of culpability, and history of violations are indicia of the *defendant's character*; the nature of the public interest in ensuring compliance with the regulations involved, the nature and circumstances of the violation at issue and the gravity of the violation go to the *seriousness of the offense*; the defendant's ability to pay, the appropriateness of the size of the penalty to the size of the defendant's business, the effect of the penalty on the defendant's ability to continue in business, and the concern that the penalty not shock the conscience of the Court go to the *practical effect of the imposition of the penalty*; and the economic benefit the defendant gained by the violation considers the *benefit gained by defendant* as a factor in deterrence.  The degree of harm to the public,  the adequacy of prior compensation to the party sought to be protected by the statute, and the value of vindicating agency authority are *public policy concerns* which consider compensation for harm to society.[15]  Thus, because of the clear Congressional preference for deterrence in this statute, this Court will, in its analysis of penalties under §1592, give more weight to the deterrence factors identified above and less to those designed to compensate society.

---

by factors of deterrence rather than compensation, since very high tariffs, in the absence of other factors, are outside the normal GATT regime.

This conclusion is further supported by Congress' decision to tie diminished levels of culpability to alternative, lesser maximum penalties.  See §1592(c)(2) (providing a civil penalty for gross negligence "not to exceed (A) the lesser of (i) the domestic value of the merchandise, or (ii) four times the lawful duties, taxes, and fees of which the United States is or may be deprived or (B) if the violation did not affect the assessment of duties, 40 per cent of the dutiable value of the merchandise") and  §1592(c)(3) (providing a penalty for negligent violations, with a penalty limit of two times the amount of lawful duties and 20 per cent of the dutiable value).

[15]        There is also a general discretion provision for "other such matters as justice may require," found in these and most statutory schemes involving courts of general legal and equitable powers.

**B**

**Analysis of Deterrence Factors In This Case Places Defendants
In The High Range Of Potential Penalties**

**1**

**Defendants' Character**

**a**

**Good Faith Effort To Comply**

A strong indicator of Defendant's character is whether there was a good faith effort to comply with the statute.  This Court fails to identify any evidence which would indicate a good faith effort to comply on the part of Defendants.  It is undisputed that Defendants knowingly entered goods by means of a material false statement, and that they intentionally violated the laws of the United States by not disclosing the true value of imported merchandise and moreover, by failing to disclose the importation of certain merchandise.  Tr. at 6-7.  See United States v. Hitachi America, Ltd., 172 F.3d 1319, 1999 WL 173695 at *5 (Fed. Cir. 1999).  Indeed, after Customs stopped and penalized Andras H. for violating the U.S. Customs laws on October 18, 1990, Defendants continued to violate the statute by misrepresenting the value of the imported merchandise.  See Complaint Ex. 1; Pretrial Order at 4.  Even when questioned by Customs, Nyakas and Andras H. provided inconsistent, false and uncooperative explanations and answers.

Defendants argue that analysis of "defendants' good faith effort to comply with the statute [should be] colored by the defendants' lack of sophistication in Customs matters and reliance on their Customs broker's advice."  Defendants' Brief at 6.  Defendants further assert that once they 'became aware of the need to file entries for their sales to U.S. customers, they enlisted the aid of

a Customs broker.  The Customs broker provided the necessary entry forms but did not explain the legal implications of listed values of the imported merchandise which defendants misstated in their subsequent entries of machine tools."  Id.   The Court flatly rejects these arguments as there is no basis whatsoever in the record to support these allegations.

Application of the good faith effort to comply factor, therefore, does not weigh in Defendants' favor, but rather tends to demonstrate bad character and supports the imposition of a heavier penalty.

**b**

**Degree of Culpability**

From the stipulated facts and the evidence adduced at trial, it is plain that Defendants specifically intended to evade the United States customs duties.  Although Defendants argue that their actions "were motivated by a desire to avoid delays in Customs clearance as well as the time and cost attendant in retaining a Customs broker," Defendants' Brief at 7, they have failed to identify, and the Court has not discovered, any record evidence of such motivation.  The Court accordingly declines to accept Defendants' argument as valid.  It is evident from Defendants' longstanding and continuous scheme to defraud the government, and the lies they told while being interviewed, Tr. at 38-43 and 64-69, that there was a high degree of culpability. Consequently, this factor weighs in favor of a heavier penalty.

**c**

**History of Violations**

Another factor useful in assessing character is the Defendants' history of previous violations.  "In determining the 'history of such violations,' courts consider the duration of defendants' current violations, whether defendants have committed similar violations in the past,

and the duration and nature of all such violations, including whether the violations are perpetual or sporadic." United States v. Gulf Park Water Co., Inc., 14 F. Supp. 2d 854, 864 (S.D. Miss. 1998) (assessing penalty for violation of Clean Water Act). There is no history of prior violations by Defendants of the Customs laws, a factor which might weigh in favor of Defendants. However, the violations admitted by Defendants in this case cover a lengthy period -- almost five years. The Court considers the longstanding nature of Defendants' violations to be significant, and therefore takes into consideration against Defendants the duration of their current violations.

## 2

## Seriousness Of The Offense

### a

### Nature of the Public Interest

A significant public interest in the enforcement of the regulations at issue militates in favor of a heavier penalty. The public interest at issue in this case is the truthful and accurate submission of documentation to Customs and the full and timely payment of duties required on imported merchandise. These are weighty interests, contravention of which necessitates the imposition of a penalty of some substance. See Modes, 17 CIT at 638, 826 F. Supp. at 514. Indeed, the Modes case did not involve any unpaid duties, yet the court emphasized the importance of the public interest at stake.

### b

### Nature and Circumstances of The Violations

The nature and circumstances of Defendants' violations present a picture of egregious disregard for the Customs laws of this country. At the time Andras H. was initially detained, he

was attempting to smuggle goods into the country to avoid payment of duties.  He responded untruthfully to Customs' questions at the time. Following the payment of the initial penalty, which provided unequivocal notice of the requirements of payment of duties, Defendants continued their attempts to evade Customs duties, both by lying during the subsequent investigation and by underreporting subsequent shipments.  This factor weighs heavily in favor of a significant penalty.

c

**Gravity of The Violation**

Gravity of the violation may be evaluated in terms of the frequency of the violations, the amount of the duties at issue, and the domestic value of the imported goods.  Defendants have stipulated to violations of the Customs laws which occurred on fifty-three separate dates, and implicated goods having a total domestic value of more than $187,000.00.  The duties evaded totaled $26,150.00.  Had interest accrued on those duties from the date of the last violation (a method of accounting most favorable to the Defendants), see Ven-Fuel, 758 F.2d at 764, the total amount would be much greater.  The violation at issue is not an isolated occurrence, but presents a pattern of gross disregard for and evasion of the Customs laws of the United States.  This factor offers nothing which would mitigate the penalty to be imposed.  Rather, it supports a significant penalty.

3

**Practical Effect Of The Imposition Of The Penalty**

a

**Defendants' Ability to Pay**

The extent of Defendants' ability to pay is a mitigating factor for the Court to consider.

At trial, Defendants entered into evidence Defendants' tax returns and unaudited financial statements.  Defendants' Exs. B, C, D and E.  Defendants argue that based on this record evidence, "it is clear that Mr. Nyakas does not have the ability to pay a penalty even remotely approaching the domestic value amount which the government is seeking."  Defendant's Brief at 8 (arguing that the domestic value of the disputed entries is twenty-nine times as large as Nyakas' total income in 1997 and more than twice as great as Subco's gross profits in 1997).

While the Court is mindful of the fact that the maximum penalty in this case is not insignificant, it is unable to accept Defendants' proffered evidence as accurate.  First, the financial statements are unaudited and the Court has been presented with no evidence to verify their accuracy.  Second, Defendants failed to provide any evidence, such as expert witness testimony *(*by, *e.g.,* an accountant qualified to analyze these foreign financial documents), to assist the Court in interpreting this evidence.  These foreign tax returns may or may not be based on laws and regulations similar to the Internal Revenue Code of the United States.

Finally, as Plaintiff effectively demonstrates, some of the non-cash expenses listed in Defendants' financial documents, such as depreciation and a bad debt write-off, do not affect ongoing cash flow since these expenses have already been paid.  Without expert testimony to explain these discrepancies, the Court is constrained to discount the weight given to Defendants' proffered financial evidence.

The Court has not completely disregarded the contents of the financial statements. Instead, the lack of expert testimony to interpret these documents has substantially limited the weight the Court assigned to this evidence and it weighed only minimally in Defendants' favor.

**b**

## The Effect of the Penalty on
## Defendants' Ability to Continue in Business

Similarly, Defendants' assertion that a large penalty would cause their business to fail is based on unaudited financial statements, and is unsupported by any expert testimony.  Once again, the Court is simply unable to give great weight to this evidence as credible or as a substantial mitigating factor on behalf of Defendants.

**c**

## Whether the Penalty To Be Imposed
## Shocks the Conscience of the Court

The Court does not find any sum within the statutory penalty range in this case to be shocking to the conscience.  In assessing this factor, the Court has considered the apparently high proportion of the Defendants' business that has derived from importation of goods into the United States, coupled with the Defendants' flagrant disregard of the duties that are necessarily attendant to Defendants' choice of this market.  Since Defendants' business relied substantially upon United States markets, a greater proportion of their assets may fairly be called upon as penalty for violations of United States law.

**4**

## Benefit Gained By Defendants

Another factor is whether Defendants benefitted from their violations.  Defendants concede that they benefitted economically from the savings of customs duties in the amount of $26,150.00, and the Court has weighed that factor in considering the appropriate penalty.

Plaintiff argues that "one of the reasons defendants were able to attract business in the United States was because they gained an unfair price advantage by circumventing payment of

proper Customs duties."  Plaintiff's Response at 15.   While the Court does not disagree that Defendants probably made some use out of the money they saved, there is no evidence in the record supporting Plaintiff's assertion, and the Court has, accordingly, disregarded it.

**C**

**While Public Policy Concerns Do Not Weigh Heavily In This Analysis,
To The Extent They Are Considered They Weigh Against Defendants**

As detailed above, § 1592 is concerned more with deterrence than with compensation. Accordingly, the Court accords less weight to those factors which revolve around compensation of the harm resulting from violations of the Customs laws.  Those factors – the degree of harm to the public and the vindication of agency authority – do not, however, favor the Defendants.

**1**

**The Degree of Harm to the Public**

Courts may also look to the degree of harm to the public in calculating the penalty amount.  Defendants argue that the degree of harm to the public was slight, claiming that "it cannot be said that the defendants substantially harmed the public by depriving the public fisc of $26,150.00."  Defendants' Brief at 7.  However, the amount of harm suffered by the Government is not limited to the dollar value of duties lost.  Snuggles, 937 F. Supp. at 927 ("[T]he purpose of this penalty is not just to replace lost levies, but to remedy a wrong.").   Cf. United States v. Alcatex, Inc., 328 F. Supp. 129, 132 (S.D.N.Y. 1971) ("It is understandable and by no means unjust, for Congress to decide that when lawbreakers are caught they should help defray the enforcement expenses . . . .).  The Government has also expended significant resources in the investigation of Defendants' violations and the enforcement of the Customs laws against

Defendants.

## 2

### The Value of Vindicating Agency Authority

In this case, it is clear that the harm suffered by the Government and the public interest in vindicating agency authority weigh heavily in favor of the Government.  Apart from the real and quantifiable expense incurred by Customs in investigating and prosecuting these violations, (*e.g.* the number of hours spent investigating this action) it is vital that the penalties imposed deter future lawbreakers from considering such actions to ensure the submission of true and accurate statements to Customs so that the agency may carry out its functions.

Defendants argue that the value of vindicating agency authority and the gravity of the violation weigh in favor of a mitigated penalty, as the Government "has already assessed criminal fines and restitution that more than offset the duties that were lost." Defendants' Brief at 9. Defendants further assert that their violation could not be considered a grave offense. Defendants' arguments, however, are misplaced.   Simply because the Government has obtained criminal fines and restitution does not mean that deterrence goals have necessarily been met.  In fact, if this were the case, the civil penalty statutes would be redundant.     In addition, the penalty must be high enough to deter others from committing these customs violations.  Cf. United States v. Municipal Authority of Union Township, 929 F. Supp. 800, 806 (M.D.Pa. 1996) ("[T]o serve the function of punishment and general deterrence, the court must bear in mind that if the regulated community perceives that violations of the law are treated lightly, the government's regulatory program is subverted.") (internal quotations omitted). Apart from any criminal sanction, while the penalty should be within fair proportion to the gravity of the offense, it must be high enough to achieve the goal of deterrence.

**D**

**Defendants' Arguments Under the Fifth and Eighth Amendments
Are Unsupported by the Law**

Defendant Andras H. also argues that since he was involved in only one violation, any penalty assessed against him should be limited.   The Court has already addressed this issue at trial, finding that the penalty assessed against Andras H. should be imposed jointly and severally as to all the Defendants for Entries 1-25 of Exhibit A and Entries 1-24 of Exhibit B.  Tr. at 7-11. All Defendants will be jointly and severally liable for the judgment awarded herein.

Defendants argue that the maximum penalty requested by Plaintiff runs afoul the Fifth Amendment's ban on double jeopardy and the Eighth Amendment's ban on excessive fines. Defendants assert that the civil penalty imposed must be limited to the actual damages suffered by the Government.  Defendants' Brief at 13, 16.  These arguments have little substance.

**1**

**Double Jeopardy Clause of the Fifth Amendment**

Defendants cite at length to United States v. Halper, 490 U.S. 435 (1989), for the proposition that "a civil penalty imposed on a defendant who was previously assessed a criminal penalty, [sic] could be sufficiently disproportionate to the violation alleged as to constitute a second punishment in violation of the double jeopardy clause." Defendants' Brief at 12.  In 1997, however, the Supreme Court in Hudson v. United States, 522 U.S. 93, 118 S. Ct. 488 (1997), overruled the holding in Halper and decided to return to the analysis enunciated in United States v. Ward, 448 U.S. 242, 248-249 (1980). Id., 118 S. Ct. at 491, 494 ("We believe that Halper's deviation from longstanding double jeopardy principles was ill considered.").   The

Court in <u>Hudson</u> explained that the Double Jeopardy Clause protects only against the imposition of multiple criminal punishments for the same offense.  118 S. Ct. at 493.  The analysis used in <u>Halper</u> failed to first determine "whether the successive punishment at issue is a 'criminal' punishment.  Instead, it focused on whether the sanction, regardless of whether it was civil or criminal, was so grossly disproportionate to the harm caused as to constitute 'punishment.'" <u>Id.</u>, 118 S. Ct. at 494.

The correct analysis is first to determine whether the penalty at issue is civil in nature. The second step is to discern whether the penalties are "'so punitive in form and effect as to render them criminal despite Congress' intent to the contrary.'" <u>Id.</u>, 118 S. Ct. at 495 (citation omitted).

Applying these traditional double jeopardy principles to the case at bar, it is clear that no amount of penalty under § 1592, including and up to the maximum allowable amount, would violate the Double Jeopardy Clause.  First, Congress intended the penalties awarded for violations of 19 U.S.C. § 1592 to be civil in nature.  28 U.S.C. §1582, which authorizes the imposition of monetary penalties for violations of § 1592, expressly provides that such penalties are civil.[16]  <u>See id.</u>  Moreover, as noted by Plaintiff, the burdens of proof enumerated by Congress in establishing liability do not rise to those required in criminal cases, *i.e.* beyond a reasonable doubt.

Turning to the second prong of the analysis,  there is no evidence that these monetary

---

[16]      18 U.S.C. § 1582 provides:

> The Court of International Trade shall have exclusive jurisdiction of any
> civil action which arises out of an import transaction and which is
> commenced by the United States–
> (1) to recover a civil penalty under section 592 . . . of the Tariff Act
> of 1930 . . . .

penalties are so punitive in form as to render them criminal in nature despite the clear civil context of the statute.  First, these penalties to not involve an "'affirmative disability or restraint,' as that term is normally understood."  Hudson, 118 S. Ct. at 496.  Second, the penalties do not come into play only after a finding of scienter.  See United States v. Hitachi America, Ltd., 964 F. Supp. 344, 371 (CIT 1997) (finding intent to defraud not a necessary element).  Third, the fact that the monetary penalties at issue may also form the basis of a criminal action and may act as a future deterrent are not sufficient "to render a sanction criminal."  Hudson, 118 S.Ct. at 496.

In any event, to the extent that Defendants argue that any civil penalties imposed would violate the Double Jeopardy Clause, this Court has already addressed and squarely rejected that argument in United States v. Complex Machine Works Co., 937 F. Supp. 943, 945 (CIT 1996), in the context of Defendants' motion to dismiss.  Therefore, the law of the case doctrine prohibits this Court's reconsideration of the issue.  See Union Camp Corp. v. United States, 963 F. Supp. 1212, 1213 (CIT 1997).

Defendants imply that the Court's earlier rejection of this argument was premature. Defendants point to three cases cited in the Court's earlier decision which, according to Defendants,  "found that dismissal of the case based on a violation of the double jeopardy clause was  inappropriate because the amount of civil penalty had yet [sic] been determined by the Court."  Defendants' Brief at 17.  Two of the cases discussed by Defendants, United States v. Ziegler Bolt and Parts Co., 19 CIT 13, 1995 WL 13448 (1995), and United States v. Valley Steel Prods. Co., 14 CIT 14, 729 F. Supp. 1356 (1990), never raised the inappropriateness of deciding this issue in relation to the Double Jeopardy Clause, although the courts did discuss this issue with reference to the Eighth Amendment.  See Ziegler, 1995 WL 13448 at *9 ("This Court will not act on an argument sounding in the Eighth Amendment before a penalty is even assessed.").

Similarly, in United States v. Dantzler Lumber & Export Co., 16 CIT 1050, 810 F. Supp. 1277 (1992), the court rejected double jeopardy arguments raised by the defendants on their motion to dismiss.  The court explained, as an apparent appeasement to the defendants, that the actual amount of penalties would be determined only at the end of a "full and fair exposition of the transactions challenged."  Dantzler Lumber, 16 CIT at 1057, 810 F. Supp. at 1284.

Defendants' assertion that the penalty amount should not exceed the loss of revenue suffered by the Government would flatly contradict the statute's express provision for a penalty up to the domestic value of the merchandise.  19 U.S.C. § 1592 (c).

**2**

**Excessive Fines Clause of the Eighth Amendment**

Defendants also claim that a penalty at the maximum end of the authorized range violates the Excessive Fines Clause of the Eighth Amendment.  This Court declines to address this argument, in view of the fact that it has not imposed the maximum penalty sought by Plaintiff. Indeed, even if the maximum penalty had been awarded, since the maximum amount "falls within the statutory limit . . . the Court cannot declare that, as a matter of law, it is excessive." United States v. Valley Steel Products Co., 15 CIT 268, 271, 765 F. Supp. 752, 754 (1991).

**CONCLUSION**

After careful consideration of the evidence presented at trial, the Court has determined that the penalty awarded to the government must be a substantial one taking into account Defendants' lack of a good faith effort to comply, the duration of their violations, and the degree of harm to the United States Customs Service as a result of Defendants' violations.  However, the Court is also mindful that while Defendants' financial statements were less than ideal, they

reflect some evidence of financial limitations.

The Court has available to it a penalty range stretching from zero to $686,000.  In the normal course, because the Defendants' character, the seriousness of their offense and the public policy concerns previously discussed weigh so heavily against them, the reasoning process here enunciated would lead to the maximum penalty.  The Court has, however, taken into account the very limited evidence provided by Defendants regarding their ability to pay and, given that limited evidence, has reduced the penalty here imposed to a figure which it believes is still sufficient to reflect the substantially heavier weight of factors against Defendants.

Based on the foregoing analysis and conclusions, the Court determines that $400,000 represents a just penalty under all the facts and circumstances in this case.  The Court accordingly grants judgment for Plaintiff and assesses a civil penalty in the amount of $400,000, plus interest from the date of judgment.

_____
Evan J. Wallach, Judge

Date:   December 14, 1999
        New York, New York