**Slip Op. 03-77**

## UNITED STATES COURT OF INTERNATIONAL TRADE

————————————————————

UNITED STATES,

                  *Plaintiff,*

          v.

NEW-FORM MANUFACTURING
    COMPANY, LTD.,

                *Defendant.*

————————————————————

Court No. 01–00034

[Judgment by default entered for Plaintiff in customs civil penalty action, imposing maximum penalty for gross negligence, and awarding interest and costs.]

Decided: June 30, 2003

<u>Robert D. McCallum, Jr.</u>, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>A. David Lafer</u> and <u>Timothy P. McIlmail</u>); <u>Kevin B. Marsh</u>, Office of the Associate Chief Counsel, Bureau of Customs and Border Protection, United States Department of Homeland Security, Of Counsel; for Plaintiff.

### OPINION

RIDGWAY, Judge:

In this customs penalty action, plaintiff, the United States, seeks a civil penalty against defendant, New-Form Manufacturing Company, Limited, Canada ("New-Form"), for conduct in connection with its importation of steel jack parts from Canada into the United States. Jurisdiction lies under 28 U.S.C. § 1582 (1994).[1]

————————————————————

[1]While all statutory citations in this opinion are to the 1994 version of the U.S. Code, the pertinent text of the cited provisions was the same at all times relevant herein.

Pending before the Court is Plaintiff's Application for Default Judgment ("Plaintiff's Application"). For the reasons set forth below, that application is granted. New-Form "has failed to plead or otherwise defend" this action, and default has been entered against it. The record further establishes that, although New-Form knew that its jack parts were subject to antidumping duties, the company failed to accurately classify and describe its merchandise on its invoices, and – when questioned by its broker – denied that the merchandise was jack parts. New-Form's conduct thus violated 19 U.S.C. § 1592, and warrants imposition of the maximum penalty for gross negligence, plus interest and costs.

## I. **Background**

### A. *The Facts of The Case*

New-Form, a Canadian corporation located in Canada, manufactured and exported steel jacks and jack parts to the United States. A81 ¶ 3, A101 ¶ 3, A113 ¶ 5(d)-(e).[2] Initially, the company

---

[2]Citations prefaced with the letter "A" are to documents included in the Appendix to Plaintiff's Application for Default Judgment ("Pl.'s Appl."). Citations prefaced with "SA" are to documents included in the Supplemental Appendix submitted with Plaintiff's Second Response to Court's May 22, 2003 Order ("Pl.'s Supp. Appl.").

Included in the Appendices are: correspondence from New-Form to the U.S. Department of Commerce concerning the antidumping finding on Steel Jacks from Canada; New-Form invoices for the merchandise at issue in this action; a telephone call sheet maintained by New-Form's broker; excerpts from an affidavit prepared by New-Form President David M. Boulanger in an unrelated case; excerpts from the transcript of testimony given at trial by Mr. Boulanger in an unrelated case; excerpts from the Complaint and Answer, as well as discovery requests and responses, in this action; the letter from New-Form's broker to Customs, transmitting payment for unpaid antidumping duties; excerpts from the transcript of Mr. Boulanger's deposition in this action; excerpts from the Harmonized Tariff Schedule of the United States; declarations prepared for this action, by a Customs special agent; Dun & Bradstreet reports on two business concerns related to New-Form; information from the website of Supplierpipeline (one of the two concerns); and several computer-generated reports prepared by Customs concerning the export activities of New-Form and Supplierpipeline.

exported completed jacks. But, eventually, it turned to exporting jack parts – including steel beams, handles, large and small runners, lifting pins, reversing levers, pitmans, reversing switches, bases, lever guards, and dowel lift pins – which were then assembled into completed jacks in this country. A66 ¶ 54, A191-92 ¶ 4.

Under cover of more than 30 entries, between February 5, 1996 and October 22, 1997, New-Form caused more than 111,000 jack parts to be entered or introduced into the United States. A84 ¶ 13, A86-87, A102 ¶ 13, A191-92 ¶ 4. Throughout that period, steel jack parts from Canada were subject to antidumping duties. *See* 61 Fed. Reg. 6,627, 6,627-28 (Feb. 21, 1996).

New-Form was aware of the antidumping duty order. Indeed, in 1993, the company sought to have the antidumping duty finding revoked. A1; 60 Fed. Reg. 53,584 (Oct. 16, 1995). However, in its notice of the final results of the 1993-94 administrative review of the finding, the U.S. Department of Commerce explained that New-Form was covered, and described the merchandise covered as "multi-purpose hand-operated heavy-duty steel jacks, . . . measuring from 36 inches to 64 inches high, assembled, semi-assembled and unassembled, *including jack parts*, from Canada." 61 Fed. Reg. 6,627, 6,627-28 (Feb. 21, 1996) (emphasis added).

Moreover, in a September 1997 affidavit (presented in the course of litigation in Canada that is unrelated to this case), New-Form's President – David M. Boulanger – explained that New-Form decided to export jack parts to U.S. to minimize applicable duties. In his words:

> [S]elling the *components* of a given product attracts less duty than would a product in a finished or assembled state; the duty payable is directly proportional to the value of the goods being shipped into the United States.

A65-66 ¶ 54 (emphasis added). *See also* A67 ¶ 59, A72, A171. Included with the affidavit was a chart, submitted by Mr. Boulanger, which indicated that New-Form's "Canadian supplied *components*" were "*subject to U.S. Antidumping duty.*" A67 ¶ 58, A69 (emphasis added).

Although New-Form knew that the components at issue were jack parts and were to be used for jacks, it failed to reflect that fact on its invoices, which were among the documents used to introduce its merchandise into the U.S. A2-63, A108 ¶ 18(b), A115 ¶ 18(b), A123-26 ¶¶ 56-59, A127 ¶ 64, A132 ¶ 64, A133 ¶¶ 56-59. New-Form's invoices also classified the jack parts by Harmonized Tariff Schedule ("HTS") numbers that do not apply to jack parts. Some parts were identified by reference to HTS 8431.10, rather than the more accurate 8431.10.0090. But other parts were identified by reference to 8201.90.60 and 7326.90. A2-63, A182-85.

Moreover, in mid-June 1996, New-Form was asked point-blank by its broker, Tower Group International ("Tower"), whether the merchandise at issue was – tracking the language of the antidumping duty finding – "heavy duty jack parts with a height of 36"-64."" New-Form responded with an unequivocal "No." A64.

Although New-Form knew that its merchandise was jack parts to be used for jacks, and although New-Form knew that jack parts were subject to antidumping duties, neither New-Form nor Tower paid those duties until years later – when Tower finally paid them, long after the merchandise had been entered, and after this action had been filed.[3] A170. The jack parts at issue were valued

---

[3]New-Form has never asserted that it believed that the antidumping duties were being paid by Tower; nor could it reasonably do so. The invoices that New-Form received from Tower during the period the merchandise was entered reflected the fact that Tower was not charging New-Form for payment of antidumping duties. *See* A133 ¶ 61.

at $81,537.31; and the revenue lost to the United States (*i.e.*, the unpaid duties) was, until Tower's payment, $18,466.84.  A192 ¶ 5.

As recently as March 2002, New-Form intended to continue doing business in the U.S., and had transferred certain of its functions and personnel to a related company called "Supplierpipeline." A172, A176-77.  Mr. Boulanger is not only the President of New-Form and, through Northman Holdings, Inc., its sole shareholder (A65, A171); he is also the President and Chief Executive Officer of Supplierpipeline, which is a subsidiary of Northman Holdings.  A171, A187; SA5-6.  And Dan Evans, a former Vice President of New-Form, is now a Vice President of Supplierpipeline.  A114 ¶ 12; SA5-6, SA10, SA12.

Although New-Form itself has not exported merchandise into this country since December 2002 (SA15-16), it appears that the company's business is being continued through Supplierpipeline. Supplierpipeline represents that it began with "[its] Milverton, Ontario operation of New-Form Manufacturing," and that it manufactures and distributes jacks.  A186; SA9.  New-Form's internet address – www.new-form.com – leads directly to the website of Supplierpipeline.  SA2 ¶ 6.  And, although Dun & Bradstreet reports that Supplierpipeline commenced business in 2000 (SA6), Supplierpipeline claims to have been doing business for 11 years.  SA11.  *See also* A186 (Supplierpipeline boasts of growth rate "for the past 12 years").  Supplierpipeline even advertises, as one of its products, the "Jackall" jack – the same jack whose parts are the subject of this litigation. A172, A186; SA12, SA14.  In fact, in March 2002, Mr. Boulanger, referring to a U.S. auto manufacturer, testified that "we're selling them Jackall jack product from Supplier Pipe Line." A172.

In its Spring 2002 newsletter, "In The Pipeline," Supplierpipeline reported that it was

> combining two of its three manufacturing facilities to offer a better freight solution
> to its customers. Currently, there are two manufacturing facilities in Mississauga and
> one in Milverton, Ontario. *The Milverton facility manufactures* Erie Wheelbarrows,
> *Jackall Jacks* and many . . . other seasonal lawn and garden products.

SA9 (emphasis added). The newsletter continued, "effective March 23rd, 2002 Supplierpipeline Inc.

will combine its Mississauga MIC Metabuilt facility *and its Milverton Newform Manufacturing*

*facility.*" *Id*. (emphasis added). Further, on January 28, 2003, in an apparent reference to its

"Milverton Newform Manufacturing facility," Supplierpipeline reported:

> The most recent "Pipeline Partner" welcomed to the group is Sinclair-Erie Ltd, a
> Canadian manufacturer of Erie wheelbarrows and contractor tools located in
> Milverton, Ontario. Sinclair-Erie has acquired a strong manufacturing operation in
> Milverton, streamlined its product offering, and is committed to delivering improved
> service levels within the next 60 days.

SA11.

Supplierpipeline identifies Sinclair-Erie as one of "two manufacturing partners" that it

"currently operates." SA13. And, although Supplierpipeline does not list the Jackall jack as one

of the products that Sinclair-Erie manufactures, Sinclair-Erie is located at the same address (37

Pacific Avenue, Milverton, Ontario) and has the same telephone and fax numbers that New-Form

used. A2-63; SA3, SA13.

Through May 2003, Supplierpipeline had exported more than $2.7 million worth of

merchandise into the United States – including, since November 9, 2002, $482,323 worth of

merchandise of which $10,000 consisted of jack parts classified under HTS number 8431.10.0090,

and $12,158 consisted of jacks. SA2 ¶ 4, SA28-46.

### B. *The Procedural Posture of The Case*

The early stages of this action were largely uneventful – discovery was completed, a pretrial conference was held, and counsel for both parties participated in a settlement conference before another judge of this Court.  Following the settlement conference, the parties were to file reports on the prospects for settling the case, together with their recommendations as to further proceedings.

The Government's post-settlement conference report advised that settlement was unlikely, and proposed a schedule for the filing of dispositive motions.  In contrast, the report filed by counsel for New-Form – barely one month after the pretrial conference – stated that the company had just declared bankruptcy, that a bankruptcy trustee had been appointed by the Canadian authorities, and that the trustee had indicated that no counsel would be engaged to represent New-Form (apparently in this or any other action).  The report concluded that it was therefore impossible "to propose any further recommendations as to further proceedings in this action."  Attached to the report was a copy of a document on the letterhead of the "Office of the Superintendent of Bankruptcy Canada."  The document, which is captioned "Certificate of Appointment" and was filed in an action styled "In the Matter of the Bankruptcy of New-Form Manufacturing Co. Ltd.," indicates that New-Form declared bankruptcy on November 7, 2002.[4]  *See also* SA 6 (indicating date of filing for bankruptcy).

Through correspondence with the Court, counsel for both parties argued the merits of various ways of proceeding in light of the bankruptcy – dispositive motions (urged by the Government), a stay of this action pending the outcome of the bankruptcy ( proposed by counsel to New-Form), and

---

[4]The notice states as the "Date and Time of Bankruptcy:  November 7, 2002, 08:30."

application for default.[5]  In the meantime, the Court and the Government began to serve all papers

on the bankruptcy trustee, as well as counsel to New-Form.[6]

_____

[5]By letter dated December 5, 2002, then-counsel for New-Form advised that his law firm "[could not] continue to represent the bankrupt," but argued that it would nevertheless "be inequitable to allow a default [against New-Form], even if that default were ultimately meaningless." Thus, at least as early as December 2002, New-Form recognized that its failure to retain substitute counsel to represent its interests in this action could result in the entry of a default judgment against it.

[6]The Court and the Government have gone to great lengths to keep New-Form and its representatives apprised of the status of this action.  By letter dated November 21, 2002, counsel for both parties were asked to advise how New-Form should be served in the future, in light of the company's bankruptcy and the prospective withdrawal of its counsel.  That same day, the clerk of the court contacted Mr. Keith Purves, Official Receiver in the Office of the Superintendent of Bankruptcy Canada, who issued the Certificate of Appointment appended to the post-settlement conference report submitted by then-counsel to New-Form.  Mr. Purves confirmed that New-Form had filed for bankruptcy and that KPMG had been appointed trustee, and advised that, as necessary, the Court should serve the Defendant through the trustee, KPMG, at a Waterloo, Ontario address which he provided.

In response to the Court's November 21 letter, then-counsel for New-Form noted that "[t]he trustee is willing to accept service of any further process in this action."  Counsel's letter was "cc'd" to "Richard Sutter, Trustee."  The court then began serving copies of all orders and correspondence from the court on Mr. Sutter of KPMG, as well as on then-counsel for New-Form.  After then-counsel for New-Form sought leave to withdraw as counsel, the Government began serving copies of all of its submissions and correspondence on counsel to KPMG as trustee.  Since that time, the court and the Government have served all papers in this action on Mr. Sutter of KPMG and/or on counsel to KPMG.  In addition, most of the more recent filings – including Plaintiff's Request for Entry of Default, Plaintiff's Application for Default Judgment, the Court's May 22, 2003 Order, and Plaintiff's Second Response to Court's May 22, 2003 Order – have also been served by mail (and, in some cases, by fax as well) on Willson International Inc. (which became New-Form's broker in December 1997) and on New-Form itself (at 37 Pacific Avenue in Milverton, Ontario).

The only document returned to the Court was the copy of its Order of May 22, 2003 that was mailed to New-Form.  The envelope containing that document was returned on June 12, 2003, stamped "Moved/Unknown" and "Return to Sender" by Canadian postal authorities.  That same order was also faxed to New-Form's fax number on May 22, 2003.  On May 26, 2003, the Court received a fax from Mr. Ted Sinclair, on the stationery of Sinclair Erie Ltd. at 37 Pacific Avenue in Milverton, Ontario (New-Form's address of record), stating: "You have sent a fax to New Form

By letter dated January 10, 2003, a Canadian law firm representing the bankruptcy trustee sought to "confirm to [the Court] that New-Form has filed an Assignment in Bankruptcy and is bankrupt." The letter emphasized that New-Form's status "is not a *proposal* in bankruptcy, and therefore is not analogous to the U.S. Chapter 11 situation. Rather, New-Form *is* bankrupt and its assets are being disposed of for distribution" in accordance with Canadian bankruptcy law. (Emphasis added.) The letter highlighted five separately-numbered points:

1. New-Form is bankrupt and will not be coming out of bankruptcy.

2. The assets of New-Form are being liquidated by secured creditors rather than by the Trustee in Bankruptcy.

3. It is expected that this will be a "no asset" bankruptcy in that the claims of secured creditors will exceed the realizable value of assets, and thus there will be no distribution to unsecured creditors.

4. Under Canadian Bankruptcy Law all proceedings against New-Form are stayed unless leave of the Bankruptcy Court is granted, and no such leave has been sought or granted.

5. The Trustee has not been funded to defend the U.S. litigation, or for that matter to fund [then-counsel to New-Form in this action].[7]

Letter to Court from Aird & Berlis LLP (Jan. 10, 2003).

---

Manufacturing Ltd. New Form Manufacturing went into receivership in November 2002. The Official Receiver for New Form is Richard Sutter of KPMG, [phone and fax numbers]. Please forward all future correspondence to Mr. Sutter as we will no longer be forwarding."

Finally, at all times, all papers and other materials filed in this matter have been on deposit with, and available to New-Form and its representatives through, the clerk of the court, as contemplated by Rule 5(b) for service where "no address is known." USCIT Rule 5(b).

[7]The letter from trustee's counsel took pains to note that the firm was not appearing as counsel in this action.

A second letter from counsel to the trustee painted an even bleaker picture of New-Form's status:

> There may be some confusion arising from different practises within the United States and Canada. In the United States . . . it may be relatively common for companies to seek the protection of Bankruptcy Courts . . . , while continuing business operations and to later emerge from bankruptcy. Although there are provisions for corporate re-organization [under Canadian law], this is not a circumstance where there is in reality any pending proceeding. The result is known. New Form has been adjudged bankrupt. It is not in the process of re-organization and is not and will not be carrying on any business. Its assets have been given to the Trustee for disposition and in fact have been disposed of. . . . In reality, this means that all of the net proceeds of realization will be going to the former bank of New Form as its secured creditor.

Letter to Court from Aird & Berlis LLP (Jan. 29, 2003).

The letter reiterated that "New Form is not now nor will it in the future be carrying on any business," and analogized "the imposition of a civil penalty to prevent future wrong in this case" as "somewhat akin to seeking leave to impose a death penalty upon a person who is already dead." The letter concluded, "Certainly, if a hearing [in the instant action] is to proceed it will proceed on an undefended basis," expressing "doubt that there is any serious precedent value in such a proceeding (if that were the aim)." *Id*.

A teleconference was scheduled in this action for early February 2003, to allow the Court and the parties to discuss the status of the case and future proceedings, in light of the two letters from counsel to the trustee as well as other developments. In the interim, then-counsel to New-Form sought leave to withdraw its appearance in this matter, which was granted.

New-Form failed to appear for the scheduled teleconference on February 7, 2003. In the course of that teleconference, the Court and counsel for the Government weighed various procedural

options. The Government argued that New-Form was already in default because of its failure to be represented on the teleconference, and advised that the Government was tentatively planning to seek a default judgment. Audiotape of February 7, 2003 Teleconference. An order issued several days later instructed New-Form to engage substitute counsel no later than March 3, 2003, warning that the company's failure to retain new counsel could result in the entry of judgment by default against it. *See* Order of February 13, 2003. There was no response of any kind to that order.

The Government filed a Request for Entry of Default on March 7, 2003. As grounds for its request, the Government pointed to New-Form's failure to retain substitute counsel as required by the Order of February 13, 2003, and invoked Rule 55(a) of the Rules of this Court, which provides for the clerk's entry of default against a party that "has failed to plead or otherwise defend." USCIT Rule 55(a). Default was duly entered on March 11, 2003.

Approximately one month later, the Government filed the Application for Default Judgment at issue here. After reviewing the Government's submission, an order was entered requiring the parties to file by specified dates certain additional information, including (1) statements as to the need for, or advisability of, a hearing or trial on damages, under the circumstances of this case; (2) statements as to whether the parties and their representatives/counsel and witnesses (if any) would appear at and participate in a hearing or trial, if one were held; (3) memoranda of law discussing the factors to be considered in determining the amount of a civil penalty, and summarizing the relevant evidence as to those factors; (4) any further evidence which should be considered in determining the amount of a civil penalty, including "any evidence bearing on (a) the finances of Defendant and any related or successor entities, and (b) any potentially exculpatory or mitigatory evidence relating either

to the issue of negligence vs. gross negligence, or to the size of any penalty"; (5) any evidence concerning New-Form's bankrupt status and the disposition of its assets; and (6) any evidence concerning "the nature and extent of the alleged involvement of Defendant's President in ongoing ventures presently doing business in the United States."  Order of May 22, 2003.

In addition, the order "once again cautioned [New-Form] that its failure to take immediate action to protect is interests [might] result in the Court's entry of judgment by default against it, with no further notice."  The Government responded to the order in a timely fashion.  *See* Plaintiff's First Response to Court's May 22, 2003 Order; Plaintiff's Second Response to Court's May 22, 2003 Order ("Pl.'s Supp. Appl.").  However, the silence from north of the border has been deafening.

In sum, notwithstanding repeated warnings of the potential consequences (including entry of default and entry of judgment by default), nothing has been heard from New-Form or from any representative of its interests since February 5, 2003, when its then-counsel withdrew from the case. New-Form was not represented on the February 7, 2003 teleconference; it failed to respond in any fashion to the Court's Order of February 13, 2003; it failed to retain substitute counsel by March 3, 2003 (as the Order of February 13, 2003 required); it failed to respond to Plaintiff's Request for Entry of Default; it never sought to set aside the default entered against it on March 11, 2003; it failed to respond to Plaintiff's Application for Default Judgment; it failed to request a hearing on damages (*i.e.*, the size of the penalty to be imposed), although the Court's May 22, 2003 Order invited it to do so; and, indeed, it flouted that Order in its entirety.

To be sure, judgment by default is an "extreme sanction" – "a weapon of last, rather than first, resort."  Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981) (citations omitted).  But, here, it

has become abundantly clear that – as counsel to the bankruptcy trustee prophesied some months ago – if this litigation proceeds, "it will proceed on an undefended basis." Letter to Court from Aird & Berlis LLP (Jan. 29, 2003). "Extreme" action is therefore appropriate.

## II. The Legal Standard for Judgment by Default

Judgment by default may be entered in a civil penalty action. Indeed, the procedure has been invoked in at least two prior civil penalty cases before this court. *See* United States v. Quintin, 5 CIT 260, 261 (1983); United States v. Almany, 24 CIT 579, 579, 110 F. Supp. 2d 977, 977 (2000).[8] Moreover, there are no special or different standards that apply in such cases. Entry of default and entry of judgment by default in civil penalty actions, as in other actions, are governed by Rule 55 of the rules of this court. *See* USCIT Rule 55.

---

[8]In United States v. Quintin, the court denied the plaintiff's motion for default judgment in a § 1592 action and set the case for trial, for two reasons. The court first noted that, although the *pro se* defendant failed to answer the amended complaint, the amended complaint "merely contain[ed] alternative claims for damages," and the defendant had filed an answer to the original complaint. The court thus apparently concluded that the defendant was not truly in default. Second, the court further noted that, based on the existing record, it simply was "not in a position to determine the basis of damage, i.e. fraud, gross negligence or negligence." 5 CIT at 261.

In United States v. Almany, the court entered partial summary judgment by default finding violations of § 1592, and ordered the parties to propose a schedule for further proceedings to determine culpability. 74 F. Supp. 2d 1345, 1349 (1999). When the defendants failed to comply with the court's order, the court entered judgment on the issue of culpability, and directed the parties to propose a schedule for proceedings to determine the amount of the penalty. 74 F. Supp. 2d at 1349. Eventually, the court entered judgment against the defendants for the maximum penalty, plus interest, after the defendants failed to respond to the court's order to show cause why judgment in favor of the United States should not be granted. United States v. Almany, 24 CIT 579, 579, 110 F. Supp. 2d 977, 977 (2000).

There was no suggestion in either Quintin or Almany that judgment by default is, as a matter of law or policy, improper in a civil penalty case. Nor has New-Form advanced any such argument.

The entry of default is a condition precedent to the entry of judgment by default.  Meehan v.

Snow, 652 F.2d 274, 276 (2d Cir. 1981).  As noted above, Rule 55(a) provides for entry of default

by the clerk of the court "[w]hen a party against whom a judgment for affirmative relief is sought

has failed to plead or otherwise defend."[9]  USCIT Rule 55(a).[10]

---

[9]Judgment by default may be entered not only under Rule 55, but also under Rule 16 (for example, for failure to obey a scheduling order or to participate in a pretrial conference) or under Rule 37 (for discovery misconduct), as well as under a court's inherent powers.  *See generally* Judgments in Federal Court § 13.01 (1997).

[10]There is some authority to the effect that Rule 55(a) "is designed to operate at the initial stages of a lawsuit," and would thus be inappropriate here.  10 James Wm. Moore *et al*., Moore's Federal Practice and Procedure § 55.10[2][b] (and cases cited there).  Parsing Rule 55(a)'s reference to a "fail[ure] to plead or otherwise defend," those authorities reason:

> The rule is written in the disjunctive.  By its express language it authorizes a default only if a party fails to plead *or* otherwise defend.  Therefore, once a party has pleaded, or has otherwise defended, may that party's subsequent conduct, such as a failure to appear at trial or a failure to comply with discovery requests, be considered a subsequent failure to "otherwise defend" so as to justify the entry of a default under Rule 55(a)?  The proper answer is no.

*Id*.  Indeed, this Court endorsed that rationale in United States v. T.J. Manalo, Inc., 26 CIT ____, ____ n.7, 240 F. Supp. 2d 1255, 1258 n.7 (2002).

But, however logical that position may appear at first blush, it is against the great weight of the authority.  Courts across the country routinely enter default and judgment by default in circumstances similar to those presented here.  *See*, *e.g.*, Alameda v. Sec'y of Health, Education and Welfare, 622 F.2d 1044, 1048 (1ˢᵗ Cir. 1980) (defendant's failure to file memoranda requested by court, or to offer explanation after months of delay, constituted failure to "otherwise defend" suit); Eagle Associates v. Bank of Montreal, 926 F.2d 1305, 1310 (2d Cir. 1991) (partnership's failure to comply with court order to retain counsel constituted failure to "otherwise defend"); Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 917-18 (3d Cir. 1992) (filing of answer to complaint did not preclude default judgment against defendant that failed to appear at trial); Home Port Rentals, Inc. v. Ruben, 957 F.2d 126, 133 (4ᵗʰ Cir. 1992) (failure to appear at show cause hearing and failure to respond to court notices constituted failure to "otherwise defend"); McGrady v. D'Andrea Electric, Inc., 434 F.2d 1000, 1001 (5ᵗʰ Cir. 1970) (failure to appear at pretrial conference and failure to comply with court orders or rules warrants default judgment under Rule 55); United States v. Di

Rule 55(b), in turn, governs the entry of judgment by default, requiring that "[i]n all cases the party entitled to a judgment by default shall apply to the court therefor."[11]  USCIT Rule 55(b). If the action is one in which the defendant has never appeared, and the plaintiff's claim "is for a sum certain or for a sum which can by computation be made certain," Rule 55(b) provides that, "upon request of the plaintiff and upon affidavit of the amount due," judgment by default in the specified amount shall be entered.  No advance notice to the defendant is required.

In contrast, where – as here – the defendant has already appeared in an action, Rule 55(b) entitles the defendant (or its representative) to 10 days' written notice of the application for default. Moreover, if the  plaintiff's claim cannot "by computation be made certain" and it is therefore

_____

Mucci, 879 F.2d 1488, 1494 (7th Cir. 1989) (where defendants failed to comply with court orders to produce documents and failed to appear at deposition, entry of default judgment under Rules 37 and 55 not an abuse of discretion); Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 856-57 (8th Cir. 1996) (corporate defendant's failure to comply with court order to appoint counsel and failure to participate in litigation after counsel withdrew warranted default judgment for failure to "otherwise defend"); Ringgold Corp.v. Worrall, 880 F.2d 1138, 1141 (9th Cir. 1989) (failure to appear at pretrial conference and at trial warranted default judgment under Rule 55).

The dicta in T.J. Manalo was thus ill-considered.  The result was nevertheless correct. *Cf.* In re First T.D. & Inv., Inc., 253 F.3d 520, 532 (9th Cir. 2001) (vacating default judgment against defaulting defendants when court later granted summary judgment in favor of other defendants, because it would be incongruous and unfair to permit plaintiff to recover against some defendants on claim that was definitively determined to be invalid); Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc., 740 F.2d 1499, 1512 (11th Cir. 1984) (default judgment against one defendant creates inconsistent verdict when other defendant prevails on merits); *see also* Frow v. De La Vega, 82 U.S. 552 (1872) (reversing default judgment as to property ownership when plaintiff lost as to answering defendants).

[11]This is just one of several ways in which this court's Rule 55 differs from the parallel Federal Rule of Civil Procedure.  Under the Federal Rules, the *clerk of the court* may enter *judgment by default* "[w]hen the plaintiff's claim . . . is for a sum certain or for a sum which can by computation be made certain" (provided that certain other conditions are met).  Fed. R. Civ. P. 55(b)(1).

"necessary to . . . determine the amount of damages," the rule provides that the court "*may* conduct such hearings or order such references as it deems necessary and proper."  USCIT Rule 55(b) (emphasis added).

Thus, because a defaulting defendant is deemed to admit all facts "well-pleaded" in the complaint against it, an entry of default generally establishes the defendant's liability.  Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975).  However, in considering whether to enter judgment by default, the court is not confined to the face of the complaint and may require the moving party to present proof of facts necessary to establish liability.  USCIT Rule 55(b).[12]  Moreover, before entering judgment by default, the court must make an independent determination on damages, unless the sum to be awarded is certain.  Credit Lyonnais Sec., Inc. v. Alcantara, 183 F.3d 151, 154-55 (2d Cir. 1999).

The plaintiff bears the burden of proving its entitlement to the requested damages, Oberstar v. FDIC, 987 F.2d 494, 505 n.9 (8th Cir. 1993), but is entitled to all reasonable inferences that may be drawn from the evidence.  Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).  In appropriate cases, detailed affidavits or other documentary evidence may suffice to fix the amount of damages for purposes of entering judgment by default.  Fustok v. Conticommodity Services, Inc.,

---

[12]Rule 55 (b) provides that "If, in order to enable the court to enter judgment or to carry it into effect, it is necessary . . . *to establish the truth of any averment by evidence* . . ., the court may conduct such hearings or order such references as it deems necessary and proper."  (Emphasis added.) *See also*  Televideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (district court "heard substantial testimony and admitted documentary evidence on all of the plaintiffs' claims"); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981) ("district court has discretion under Rule 55(b)(2) once a default is determined to require proof of necessary facts").

873 F.2d 38, 40 (2d Cir. 1989).  There is no iron-clad rule requiring a hearing or trial on damages

in every case.  *Id.*[13]

---

[13]Rule 55(b) is, on its face, permissive:  "[T]he court *may* conduct such hearings or order such references as it deems necessary and proper . . . . "  Some cases nevertheless say – or at least appear to say – that an inquest, an evidentiary hearing, or a trial on damages is necessary before entering default judgment whenever a plaintiff's claim is not for a sum certain.  *See*, *e.g.*, Eisler v. Stritzler, 535 F.2d 148, 153-54 (1ˢᵗ Cir. 1976) (where plaintiffs' claims not liquidated, evidentiary hearing is required to assess damages before entry of default judgment); Jackson v. Beech, 636 F.2d 831, 835 (D.C. Cir. 1980) ("a court must hold a hearing on damages before entering a [default] judgment on an unliquidated claim even against a defendant who has been totally unresponsive"). But, even in jurisdictions where a hearing may have been required in the past, it seems that the rule may be eroding.  *Compare* Eisler, *supra*, *with* Home Restaurants, Inc. v. Family Restaurants, Inc., 285 F.3d 111, 114 (1ˢᵗ Cir. 2002) (hearing on damages not required where complaint and cross-claim sought "specific dollar figures," where court received affidavits on damages, and where defendant had opportunity to respond prior to entry of default judgment); *compare* Jackson, *supra*, *with* Int'l Painters and Allied Trades Industry Pension Fund v. R.W. Amrine Drywall Co., 239 F. Supp. 2d 26, 30 (D.D.C. 2002) ("court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment").

The great weight of the authority thus holds that there is no "hard and fast" requirement for a hearing on damages before entering judgment by default on an unliquidated claim.  *See*, *e.g.*, Fustok v. Conticommodity Services, Inc., 873 F.2d 38, 39 (2ᵈ Cir. 1989) (court properly relied on detailed affidavits and documentary evidence, as well as its own knowledge of case, in determining damages, where damages "were neither liquidated nor capable of mathematical calculation"); Curtis T. Bedwell and Sons, Inc. v. Int'l Fidelity Ins. Co., 843 F.2d 683, 689, 697 n.25 (3ʳᵈ Cir. 1988) (damages hearing not required before entering default judgment under Rule 37 where damages established through "over 200 pages of affidavits and documentation," and where preclusive order "would [have] render[ed] any hearing on damages meaningless"); Mut. Fed. Sav. and Loan Ass'n v. Richards & Associates, Inc., 872 F.2d 88, 94 (4ᵗʰ Cir. 1989) (no abuse of discretion to enter almost $9 million default judgment under Rule 37 without hearing on damages); James v. Frame, 6 F.3d 307, 309-11 (5ᵗʰ Cir. 1993) (where $10.2 million default judgment is entered late in litigation, so that court has "long and close familiarity" with case, and "where the evidence before the court allows it to make findings based upon that evidence, the court need not jump through the hoop of an evidentiary hearing"); United States v. DeFrantz, 708 F.2d 310, 312-13 (7ᵗʰ Cir. 1983) (no damages hearing required under Rule 55 where motion for default judgment under Rule 37 specified amount of damages sought, yet defendant never questioned the sum); Taylor v. City of Ballwin, Mo., 859 F.2d 1330, 1332-33 (8ᵗʰ Cir. 1988) (where facts on the record indicated reasonable fair market value of merchandise, court "need not hold an evidentiary hearing on the issue of damages").

### III.  Analysis

### *A.  Mootness*

In light of New-Form's bankrupt status, there arises – as a threshold matter – a question of mootness.  The Government maintains that "there is no indisputable evidence in the record" to establish that New-Form has been adjudged bankrupt.  Pl.'s Supp. Appl. at 1-2.  The Government concedes that "Dun & Bradstreet reports that New-Form entered bankruptcy on November 7, 2002, and that New-Form, currently, has no assets or liabilities."  Pl.'s Supp. Appl. at 2 (*citing* SA6).  But, quoting  Rule 201 of the Federal Rules of Evidence, the Government argues that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Id*.  Asserting that "the

---

In light of the affidavits and documentary evidence proffered by the Government, there is no need here for an evidentiary hearing on damages.  This is all the more true since New-Form has not requested such a hearing.  Indeed, New-Form never even responded to the Court's request for the company's views on the need for or advisability of a hearing.  *See* Order of May 22, 2003.  Nor did New-Form advise whether its representatives and/or witnesses would appear at a hearing or trial on damages if one were held, although the company was ordered to do.  *Id*.  New-Form's intransigence indicates that a hearing on damages would have been little more than an empty exercise.  *Cf*. Curtis T. Bedwell and Sons, 843 F.2d at 697 (damages hearing not required where, *inter alia*, preclusion order "would [have] render[ed] any hearing on damages meaningless); Davis v. Fendler, 650 F.2d 1154, 1161-62 (9th Cir. 1981)  (defendant cannot be heard to complain that default judgment was entered without hearing on damages where not only did documentary evidence substantiate damages awarded, but court scheduled hearing to address, *inter alia*, damages, and defendant waived right to appear and testify).

source of the information reported by Dun & Bradstreet may reasonably be questioned," the Government concludes that New-Form's bankrupt status is not subject to judicial notice.  *Id*.[14]

However, the Dun & Bradstreet report is admissible as evidence of New-Form's bankrupt status – "for the truth of the matter asserted" – without regard to the doctrine of judicial notice.  Rule 803(17) of the Federal Rules of Evidence establishes an exception to the hearsay rule for "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations."  Fed. R. Evid. 803(17).  The report at issue – compiled largely from public records by one of the world's leading providers of global business information, and offered through a subscriber service aimed at the business and financial communities – is clearly the sort of record contemplated by Rule 803(17).[15]

---

[14]Quite apart from the Dun & Bradstreet report, judicial notice is appropriate here.  The Court may take judicial notice of the Canadian court's bankruptcy records to establish the fact that New-Form has been adjudged bankrupt in Canada.  As the Court of Appeals has recognized, "[T]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records." Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1417 n.7 (Fed. Cir. 1997) (*citing* Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989), *quoting* 21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5106, at 505 (1977) ).  *See also* United States v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (noting that court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.") (citations omitted).

However, judicial notice of a sister court's records is taken for the limited purpose of recognizing that court's judicial act.  It does not recognize the sister court's findings of fact as true. United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994).

[15]The information contained in the Dun & Bradstreet report is consistent with a record produced by an "Insolvency Name Search" conducted through the official website of the Office of the Superintendent of Bankruptcy Canada using the identification number of New-Form's case – 35-103918.  The website is maintained by Industry Canada, a department of the Canadian Government.  The record was thus produced by an agency of the Canadian Government, and reflects factual findings made by the Canadian Office of the Superintendent of Bankruptcy, pursuant to Canada's Bankruptcy and Insolvency Act.

Because the Constitution generally restricts the exercise of judicial power to live "Cases" and "Controversies" (U.S. Const. art. III, § 2, cl. 1), the bankruptcy of a defendant conceivably could leave a plaintiff with no hope of recovery; and the impossibility of recovery could arguably render the case moot.  However, that is not the situation here.  A case is not moot as long as there is at least a metaphysical possibility of recovery.  *See, e.g.*, Ratner v. Sioux Natural Gas Corp., 770 F.2d 512, 516-17 (5th Cir. 1985).  As the Government notes, and as discussed in greater detail here (both above and below), the integral involvement of New-Form's President and sole shareholder – Mr. Boulanger – in Supplierpipeline, an ongoing venture presently doing business in this country, opens at least a potential avenue for recovery beyond New-Form, and thus precludes the dismissal of this action as moot.  Pl.'s Supp. Appl. at 7-8.

### B.  Liability Under 19 U.S.C. § 1592

Although the entry of default precludes New-Form from controverting the factual allegations of the Complaint, a default neither establishes legal arguments made in the pleadings, nor requires the entry of judgment on a legally unsound claim.  *See, e.g.*, Premier Bank v. Tierney, 114 F. Supp.

---

The record indicates as the date of bankruptcy "2002/11/07" and lists New-Form's "Total Liabilities" and "Total Assets" at $7,166,045 and $2,831,349, respectively.  Those statements are admissible "for the truth of the matter asserted," because the record  falls squarely within Rule 803(8) of the Federal Rules of Evidence, which excepts from the hearsay rule "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law unless the sources of information or other circumstances indicate lack of trustworthiness."  Fed. R. Evid. 803(8).

2d 877, 880 (W.D. Mo. 2000); In re Indus. Diamonds Antitrust Litig., 119 F. Supp. 2d 418 (S.D.N.Y. 2000). Thus, even after default, it must be determined "whether the unchallenged facts constitute a legitimate cause of action." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, Civil 3d § 2688, at 63 (1998).

In this case, the unchallenged facts establish gross negligence under 19 U.S.C. § 1592. That statute prohibits parties from entering, introducing, or attempting to enter or introduce any merchandise into the commerce of the United States by means of "any document or electronically transmitted data or information, written or oral statement, or act which is material and false," or "any omission which is material." 19 U.S.C. § 1592(a)(1)(A)(i)-(ii). A violation is grossly negligent if it results from an act or acts – whether of omission or commission – "done with actual knowledge of or wanton disregard for the relevant facts and with indifference to or disregard for the offender's obligations under the statute." 19 C.F.R. Pt. 171, App. B § (B)(2) (1996).[16]

Here, New-Form introduced merchandise into the commerce of this country by means of false written and oral statements, and by omissions. Customs regulations require that invoices for machine parts classifiable under the HTS specify the type of machine for which the parts are intended. 19 C.F.R. § 141.89(a). New-Form's invoices nevertheless failed to accurately describe its merchandise, in violation of the regulation. A2-63. Further, the invoices identified jack parts by HTS numbers other than HTS 8431.10.0090, the correct classification. A2-63, A182-85. On one

---

[16]While all citations to the Code of Federal Regulations in this opinion are to the 1996 version, the pertinent text of the referenced provisions was the same at all times relevant herein.

occasion, New-Form even flatly denied to its broker that it was exporting heavy-duty jack parts. A64.

Moreover, New-Form's statements, acts and omissions were material.  The measurement of materiality is the potential impact on Customs' determination of the applicable duties.  *See* United States v. Menard, Inc., 16 CIT 410, 417, 795 F. Supp. 1182, 1188 (1992).  Here, New-Form exported jack parts from Canada, when jack parts from Canada were subject to antidumping duties.  61 Fed. Reg. at 6,627-28.  New-Form's statements, acts and omissions related to whether its merchandise was jack parts and, thus, whether the merchandise was subject to antidumping duties.

Finally, New-Form acted with gross negligence.  New-Form knew that its merchandise was jack parts to be used for jacks.  A123-26 ¶¶ 56-59, A127 ¶ 64, A132 ¶ 64, A133 ¶¶ 56-59.  New-Form knew that jack parts were subject to antidumping duties.  A69.  And New-Form knew that its broker was not paying those duties.  *See* A133 ¶ 61.  Nevertheless, on its invoices, New-Form identified its merchandise using HTS numbers that did not apply to jack parts, and failed to accurately describe the merchandise.  A2-63, A182-85.  Again, New-Form even denied to its broker that it was exporting jack parts.  A64.  New-Form's conduct thus evidenced not only its knowledge of and wanton disregard for relevant facts, but also its manifest indifference to and disregard for its obligations under the customs laws of this country.

### C.  The Size of The Penalty

The Government seeks the maximum penalty for New-Form's gross negligence – under 19 U.S.C. § 1592(c)(2)(A)(i)-(ii), the lesser of "the domestic value of the merchandise" at issue, or "four

times the lawful duties, taxes, and fees of which the United States is or may be deprived."  Pl.'s Appl. at 12, 14; Pl.'s Supp. Appl. at 3.

The factors to be considered in determining the size of a penalty are enumerated in United States v. Complex Machine Works Co., 23 CIT 942, 949-50, 83 F. Supp. 2d 1307, 1315 (1999): (1) the defendant's good faith effort to comply with the statute; (2) the defendant's degree of culpability; (3) the defendant's history of previous violations; (4) the nature of the public interest in ensuring compliance with the applicable law; (5) the nature and circumstances of the violation; (6) the gravity of the violation; (7) the defendant's ability to pay; (8) the appropriateness of the size of the penalty vis-a-vis the defendant's business, and its effect on the defendant's ability to continue doing business; (9) whether the penalty shocks the conscience of the court; (10) the economic benefit to the defendant as a result of the violation; (11) the degree of harm to the public; (12) the value of vindicating agency authority; and (13) whether the party sought to be protected by the statute has been adequately compensated for the harm; as well as (14) such other matters as justice may require. *Id*.  The first 10 factors are largely remedial and relate essentially to deterring future violations, the primary focus of Congress in enacting § 1592.  Accordingly, those factors are to be accorded greater weight in determining the size of a penalty.  23 CIT at 950, 950, 83 F. Supp. 2d at 1315-16, 1319.

As discussed below, application of the Complex Machine Works factors to the facts of this case supports the imposition of the maximum penalty for gross negligence – $73,867.36, or four times the revenue lost by the Government (and less than the $81,537.31 domestic value of the subject jack parts).  New-Form elected to present no evidence or argument in mitigation.  And

independent analysis reveals that all – or virtually all – of the relevant factors weigh heavily in favor of a substantial penalty; certainly, none of the factors weighs against it.

***Defendant's Character:***
***Extent of Good Faith Effort to Comply, Degree of Culpability,***
***and History of Prior Violations***

The first three factors set forth in <u>Complex Machine Works</u> – the defendant's good faith effort to comply with the statute, the defendant's degree of culpability, and the defendant's history of prior violations – are indicia of a defendant's character. 23 CIT at 950, 83 F. Supp. 2d at 1316.

As <u>Complex Machine Works</u> points out, "[a] strong indicator of [a defendant's] character is whether there was a good faith effort to comply with the statute." 23 CIT at 951, 83 F. Supp. 2d at 1316. The record in this action belies any suggestion that New-Form made a significant good faith effort to comply with the law. Although New-Form retained a licensed customhouse broker, the company affirmatively denied to that broker that the merchandise at issue was jack parts. A64, A82 ¶ 7, A102 ¶ 7, A114 ¶ 10, A133 ¶¶ 56-59. Application of the "good faith effort to comply" factor thus weighs in favor of the imposition of a heavy penalty. *Cf*. <u>Complex Mach. Works</u>, 23 CIT at 951, 83 F. Supp. 2d at 1316 ("good faith effort to comply" factor supported heavy penalty where defendants gave inconsistent, false and uncooperative responses and explanations to Customs).

A heavy penalty is also warranted by New-Form's "degree of culpability." Specifically, New-Form knew that its merchandise was jack parts (A133 ¶¶ 56-59), that jack parts were subject to antidumping duties (A69), and that its broker was not paying those duties. *See* A133 ¶ 61. Nevertheless, on its invoices, New-Form classified its merchandise according to HTS numbers that did not apply to jack parts, and failed to describe the merchandise as parts of jacks which were to be

used with jacks. A2-63, A182-85. New-Form even denied, to its broker, that it was exporting jack parts. A64. Moreover, the sheer number and frequency of New-Form's violations are telling. A84 ¶ 13, A85-87, A102 ¶ 13, A191-92 ¶ 4. This was no isolated incident. Thus, as in Complex Machine Works, the record here reflects a high degree of culpability and merits a penalty at the high end of the range. 23 CIT at 951-52, 83 F. Supp. 2d at 1316-17.

The "history of previous violations" factor counsels a heavy penalty as well. The duration of a defendant's current violations can weigh in favor of a heavy penalty even where there is no history of previous violations. Complex Mach. Works, 23 CIT at 952, 83 F. Supp. 2d at 1317. Although New-Form had no history of customs violations before it began exporting jack parts to the United States, the violations at issue here involved more than 111,000 jack parts entered on more than 30 separate occasions spanning more than a year and a half. A84 ¶ 13, A85-87, A102 ¶ 13, A191-92 ¶ 4. As in Complex Machine Works, the relatively longstanding course of violations in this case is significant. 23 CIT at 952, 83 F. Supp. 2d at 1317.

### Seriousness of Offense:
### Public Interest in Compliance, Nature and Circumstances of Violation, and Gravity of Violation

As Complex Machine Works observed, "[a] significant public interest in the enforcement of the regulations at issue militates in favor of a heavier penalty." 23 CIT at 952, 83 F. Supp. 2d at 1317. There, as here, "[t]he public interest at issue . . . is the truthful and accurate submission of documentation to Customs and the full and timely payment of duties required on imported merchandise." *Id*. In this action, the Government asserts that, even though New-Form has not exported merchandise to the United States since December 2002 (SA15-16), there is "no evidence

of record that [New-Form] is bankrupt, has dissolved, or that it will not resume business and exports to the United States in the future, such that a penalty would have no deterrent effect upon New-Form itself." Pl.'s Supp. Appl. at 5.

As discussed above, however, New-Form's bankrupt status is established by the Dun & Bradstreet report which was proffered by the Government and is admissible "for the truth of the matter asserted." *See* section III.A, *supra*. It is nevertheless true that, even if New-Form is permanently defunct, the imposition of a substantial penalty in this case may well have a salutory effect upon the future conduct of others exporting to this country (including, in particular, Supplierpipeline and Mr. Boulanger, both of which are closely tied to New-Form), deterring them from conduct of the type in which New-Form engaged.

The "nature and circumstances of the violations" committed by New-Form also compel a heavy penalty. New-Form knew that it was exporting jack parts that were subject to antidumping duties that its broker was not paying. Yet the invoices New-Form prepared failed to accurately describe and classify those jack parts. Indeed, New-Form even denied to its broker that it was exporting jack parts. A2-64, A133 ¶¶ 56-59, A61, A69, A182-85. As the Government so succinctly puts it, New-Form's "knowledge, failure, and denial weigh in favor of a heavy penalty." Pl.'s Supp. Appl. at 8.

For purposes of determining the size of a penalty, the "gravity of the violations" can be assessed "in terms of the frequency of the violations, the amount of the duties at issue, and the domestic value of the imported goods." Complex Mach. Works, 23 CIT at 953, 83 F. Supp. 2d at 1317. As in Complex Machine Works, the conduct at issue here "[was] not an isolated occurrence,

but [rather] presents a pattern of gross disregard for and evasion of the Customs laws of the United States." 23 CIT at 953, 83 F. Supp. 2d at 1317-18. Specifically, New-Form's violations spanned more than 30 entries over a period of one and a half years – a rate of nearly one entry every two weeks. A2-63, A84 ¶ 13, A85-87, A102 ¶ 13, A191-92 ¶ 4. The amount of the duties at issue totals nearly $19,000; and the domestic value of the imported goods exceeds $81,000. A192 ¶ 5. Had interest accrued on the antidumping duties from the date of the last violation in October 1997 through October 2001 (when New-Form's broker paid the duties) (A170), the total amount would be even greater. In short, like the other factors discussed above, the gravity of the violations here weighs decisively against New-Form and in favor of the maximum allowable penalty.

### *Practical Effect of Penalty:*
### *Defendant's Ability to Pay, Relationship of Size of Penalty to Defendant's Business and Effect on Ability to Continue Doing Business, and Whether Penalty Shocks Conscience*

The "defendant's ability to pay" must also be considered in determining the size of a penalty. New-Form's financial status is thus once again implicated. Again, the Government argues that there is no affirmative evidence in the record to indicate that New-Form would be unable to pay the maximum allowable penalty. Pl.'s Appl. at 15; Pl.'s Supp. Appl. at 9. The Government notes that there are, for example, no audited financial statements, or expert testimony (by, for example, a witness qualified to explain Canadian bankruptcy law). *Cf.* Complex Mach. Works, 23 CIT at 954, 83 F. Supp. 2d at 1318 (evidence such as unaudited financial statements and foreign tax returns are accorded little weight).

But, to the contrary, as discussed above, New-Form's bankrupt status is properly a matter of record in this action. Ordinarily, the bankruptcy of a defendant might contraindicate a substantial

penalty (and, indeed, could conceivably moot a case).  Here, however, the record evidence establishes the close relationship between New-Form and Supplierpipeline – a company which has, in recent months, exported nearly half a million dollars worth of merchandise into this country.  SA2 ¶ 4.  That level of business activity in the United States suggests that both Supplierpipeline and Mr. Boulanger –  the President and sole shareholder of both companies (A65; SA5-6) – are potential sources for payment of any penalty imposed upon New-Form.  *See* Restatement (Second) of Judgments § 59 comment g (1982) ("a judgment nominally against the corporation creates a binding obligation upon those who have acted in corporate dress").  As recently as January of this year, Supplierpipeline boasted that it was progressing "toward its goal of $100 million annual sales," and that it "has enjoyed compounded annual growth of over 50% for the last 11 years straight."  SA11. Under these circumstances, consideration of the "ability to pay" factor does not preclude the imposition of a substantial penalty.

Nor does the "ability to continue doing business" factor give pause.  Even if New-Form is not now doing business, and even though it has not exported merchandise to the United States since December 2002 (SA15-16), Supplierpipeline is an ongoing, closely-related business concern which appears to have sufficient resources to pay the maximum penalty without jeopardizing its continued operation.  SA2, SA6, SA11.

Moreover, even the maximum penalty in this case should not "shock the conscience" of a court.  The importance of the United States to a defendant's business and the degree to which the defendant disregards the customs laws of this country are relevant to this factor.  Complex Mach. Works, 23 CIT at 954, 83 F. Supp. 2d at 1318.  New-Form viewed the United States as such an

important market for its jacks that it requested that Commerce review the antidumping finding that applied to those jacks (A1); and the company established an assembly operation here to reduce the applicable antidumping duties.    A66 ¶ 54, A69.    Even if New-Form is now bankrupt, Supplierpipeline continues to export merchandise to the United States.  SA2, SA6, SA11.  And, in October 2002, Supplierpipeline announced plans to "open[ ] a second Western US based warehouse . . . to further enhance coverage for the North American market."  SA10.  As in Complex Machine Works, "[s]ince [the defendants'] business relied substantially upon United States markets, a greater proportion of their assets may fairly be called upon as [a] penalty for violations of United States law."  23 CIT at 954, 83 F. Supp. 2d at 1318.  This factor thus supports a heavy penalty.

### *Economic Benefit to Defendant Resulting from Violation*

Consideration of the "economic benefit to the defendant" is damning as well.  New-Form's violations resulted in lost revenue to the United States in the sum of $18,466.84 in unpaid antidumping duties (A192 ¶ 5) – savings that flowed directly to New-Form.  New-Form never paid a penny of those duties; its broker paid them.  A170.

### *Public Policy Concerns:*
### *Degree of Harm to Public, Value of Vindicating Agency Authority,*
### *and Whether Damaged Party Has Been Compensated for Harm*

While the factors discussed above relate primarily to deterring future violations, the three remaining specific factors – the degree of harm to the public, the value of vindicating agency

authority, and the extent to which the damaged party has been compensated for its harm – are concerned with compensating society. Accordingly, they are to be accorded less weight. Complex Mach. Works, 23 CIT at 950, 955, 83 F. Supp. 2d at 1315-16, 1319. They do not, in any event, favor New-Form.

The "harm to the public" here is clear. New-Form's violations resulted in the dumping of its jack parts into the United States – which, by definition, damaged the domestic jack industry. Moreover, "the amount of harm suffered by the Government is not limited to the dollar value of duties lost." Complex Mach. Works, 23 CIT at 955, 83 F. Supp. 2d at 1319. New-Form's conduct necessitated a Customs investigation and eventually led the Department of Justice to bring this action. The cost of investigating and prosecuting a customs penalty action is an independent harm to the Government, and is to be considered in determining the size of a penalty. *Id*.

Although its broker has (albeit belatedly) paid the duties lost as a result of New-Form's actions (A170), the Government has yet to be compensated for the expense of the administrative and judicial proceedings that New-Form's conduct spawned. Both the "harm to the public" and "adequacy of compensation" factors thus support the imposition of a substantial penalty.

So too the public interest in "vindicating agency authority" weighs against New-Form, and in favor of the Government. "[I]t is vital that the penalties imposed deter future [potential] lawbreakers from considering [conduct such as that at issue here] to ensure the submission of true and accurate statements to Customs so that the agency may carry out its functions." Complex Mach. Works, 23 CIT at 955, 83 F. Supp. 2d at 1319.

As discussed above, even if a heavy penalty in this case has no deterrent effect on New-Form, it may deter others who export into the United States – including Supplierpipeline and Mr. Boulanger, in particular – from engaging in the type of conduct in which New-Form engaged. *See* Complex Mach. Works, 23 CIT at 955, 83 F. Supp. 2d at 1319 (penalty may deter future exporters from engaging in similar conduct).

### *Such Other Matters As Justice May Require*

The final "catch-all" factor to be considered is "such other matters as justice may require." On this point, the Government emphasizes that – even if New-Form is bankrupt – it entered bankruptcy less than two weeks before this action had been scheduled to go to trial. SA6; Order Governing Preparation for Trial ¶ 8 (Aug. 14, 2002) (trial to commence November 20, 2002). The Government argues that, as a matter of policy, bankruptcy should not be a haven for wrongdoers. Pl.'s Supp. Appl. at 12 (*citing* Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc., 700 F.2d 1279, 1283 (9th Cir. 1983)). The Government therefore concludes that justice requires that New-Form's current status not shield the company from liability for its actions. Pl.'s Supp. Appl. at 12. While the case for the maximum penalty is already compelling, this final factor may also militate in favor of a heavy penalty. At a minimum, it does not weigh against it.

## IV.  <u>Conclusion</u>

For all the reasons set forth above, Plaintiff's Application for Default Judgment is granted. New-Form's conduct violated 19 U.S.C. § 1592, and warrants imposition of the maximum civil penalty for gross negligence – in this case, $73,867.36, plus interest and costs.

Plaintiff shall submit within 30 days hereof a proposed final judgment in conformity with this opinion, with any response by Defendant due within 10 days thereafter.

So ordered.

_____
                        Delissa A. Ridgway, Judge

Decided:  June 30, 2003
                New York, New York